James R. Batchelder (CSB # 136347)
David S. Chun (CSB # 315958)
Henry Y. Huang (CSB # 252832)
**ROPES & GRAY LLP**
1900 University Ave. Sixth Floor
East Palo Alto, CA 94303-2284
Tel: (650) 617-4000
Fax: (650) 617-4090
james.batchelder@ropesgray.com
david.chun@ropesgray.com
henry.huang@ropesgray.com

Peter M. Brody (*pro hac vice* pending)
**ROPES & GRAY LLP**
2099 Pennsylvania Ave. NW
Washington, DC 20006-6807
Tel: (202) 508-4600
Fax: (202) 508-4650
peter.brody@ropesgray.com

Attorneys for Plaintiff
BECTON, DICKINSON AND COMPANY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BECTON, DICKINSON AND COMPANY, | C.A. No._____ |
| Plaintiff, | **COMPLAINT** |
| v. | 1. **VIOLATION OF DEFEND TRADE SECRETS ACT** |
| CYTEK BIOSCIENCES INC., MING YAN, ALFRED RILEY, DAVID VRANE, STEPHEN ZHANG, ZHENXIANG GONG, ALEX ZHONG, MARIA JAIMES, GIL REININ, and JANELLE SHOOK, | 2. **AIDING AND ABETTING VIOLATION OF THE DEFEND TRADE SECRETS ACT** |
| | 3. **VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT** |
| Defendants. | 4. **VIOLATION OF CAL. BUS & PROF. CODE SECTION 17200** |
| | 5. **BREACH OF CONTRACT** |
| | 6. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | 7. **INDUCING BREACH OF CONTRACT** |
| | 8. **UNJUST ENRICHMENT** |
| | 9. **BREACH OF CONFIDENCE** |
| | 10. **COMMON LAW CONVERSION** |
| | **DEMAND FOR JURY TRIAL** |

1    This is a civil action by Plaintiff Becton, Dickinson and Company ("BD," or "Plaintiff"), by

2 and through their attorneys, arising out of misappropriation of BD's property, including confidential,

3 proprietary, and trade secret information, by Cytek Biosciences Inc. ("Cytek") and former BD

4 employees Ming Yan ("Yan"), Alfred Riley ("Riley"), David Vrane ("Vrane"), Stephen Zhang

5 ("Zhang"), Zhenxiang Gong ("Gong"), Alex Zhong ("Zhong"), Maria Jaimes ("Jaimes"), Gil Reinin

6 ("Reinin"), and Janelle Shook ("Shook").  Plaintiff hereby alleges as follows upon information and

7 belief:

8 ## NATURE OF THE ACTION

9    1.    This lawsuit arises from theft of BD's secret technical specifications, source code,

10 and designs related to the field of flow cytometry.  Formerly a small company that serviced BD

11 products, Cytek recently hired away nearly a dozen scientists, engineers, and businesspeople from

12 BD and employed them to develop products that compete unfairly with their former company's

13 product lines.  When they left BD to work for Cytek and thereafter, those employees, upon

14 information and belief, improperly retained and misused BD's valuable, highly confidential,

15 proprietary information, including thousands of confidential and valuable technical files that they

16 had downloaded from BD's computer systems onto removable storage media while employed by

17 BD.  Despite BD's diligent efforts to recover those devices and files, and its inquiries to Cytek and

18 the former employees—indeed, BD gave Cytek a list of serial numbers of unrecovered storage media

19 known to have been used by the employees—the vast majority of the storage devices and files have

20 not been recovered.  Cytek has not investigated and disclosed the extent to which it and its employees

21 have or have shared confidential BD information, and how any such information has been used,

22 forcing BD to file this case to safeguard its trade secrets and other valuable property.

23    2.    BD is a world-renowned medical technology company founded in 1897 that serves

24 healthcare institutions, life science researchers, clinical laboratories, industry, and the general public.

25 With more than a century of experience, BD manufactures and sells a broad range of medical

26 supplies, devices, laboratory equipment, and diagnostic products to enable medical research and

27 assist clinical laboratories.  Research, development, and innovation for new technologies and

28 products are at the core of BD's mission and corporate identity and are critical to BD's competitive

COMPLAINT                                              CASE NO. _____

1  advantages in the marketplace.  Among other products, the BD Biosciences business unit of the
2  company has for decades researched, developed, and produced flow cytometers.  These complex and
3  sophisticated instruments, the product of years of research and development, use lasers to count and
4  detect properties of human cells, assisting research and clinical practice.

5      3.      In roughly 2012, BD started development on a spectral flow cytometer, a new type of
6  flow cytometer that analyzes the light detected by a flow cytometer differently to optimize sensitivity
7  and flexibility.  This project was known internally as "Project Newton."  Defendants Yan, Riley,
8  Vrane, Zhang, Gong, Zhong, Jaimes, Reinin, and Shook (the "Individual Defendants") worked on
9  Project Newton and/or other confidential flow cytometer products.  Their collective exposure to BD's
10 confidential information spanned the areas of physics, chemistry, biology, fluidics, optics, electrical
11 engineering, and computer science.  Each of these former BD employees had access to BD's
12 confidential information related to Project Newton and numerous other trade secrets involving flow
13 cytometry.

14     4.      Formed in the early 1990s, Cytek is a small company that had not produced flow
15 cytometers of its own, but rather serviced and customized BD flow cytometers.  Starting in 2015,
16 Cytek began hiring current and former BD employees for the purposes of developing flow
17 cytometers, including each of the Individual Defendants.  In particular, after BD prioritized other
18 products over Project Newton, Yan left BD and joined Cytek as Chief Technology Officer.  Cytek
19 and Yan then recruited other Individual Defendants to join Cytek, each of whom had worked on flow
20 cytometers at BD.  In March 2017, less than two years after it began hiring this group of BD
21 employees, Cytek—which for two decades had never produced or sold its own flow cytometer—
22 began selling its own flow cytometer products under the Athena$^{TM}$ name.  In June 2017, Cytek
23 introduced the Aurora$^{TM}$ line of spectral flow cytometers.  Cytek has said that its products would
24 compete against BD products, among others, in the United States and worldwide.

25     5.      Before leaving BD, each of the Individual Defendants downloaded files to removable
26 storage media.  BD's own forensic analysis revealed that these storage media contained thousands
27 of files, including confidential, trade secret information about the hardware and software of BD's
28 designs, including Project Newton.  Only a handful of these removable storage drives have been

COMPLAINT                                    CASE NO. _____

1  found after diligent efforts to locate them.  From the day each employee joins the company, BD

2  expressly warns its associates not to take confidential information if and when they leave BD and

3  *never* to give it to, or use it for the benefit of, unaffiliated third parties.  BD's employee agreements,

4  training, annual certifications, and other forms instruct employees to maintain the confidentiality of

5  sensitive company information.

6        6.    The Individual Defendants improperly downloaded, removed, and failed to return

7  thousands of files with BD's valuable, highly confidential, proprietary information before departing

8  to Cytek, which then immediately launched its own cytometers and substantially similar products

9  within a shortened time frame—a feat that was aided by Cytek's improper access to and misuse of

10  BD's confidential information.  Those former employees had years—sometimes decades—of access

11  to BD's proprietary product designs and research data in flow cytometry.  Judicial intervention is

12  required to hold Cytek and the Individual Defendants responsible for this theft of BD's critical trade

13  secrets and to prevent Cytek from continuing its development and sale of competing products through

14  wrongful, improper, and illegal means.

15                      **PARTIES**

16        7.    BD is a corporation duly organized under the laws of the State of New Jersey, and

17  maintains its principal place of business at 1 Becton Drive, Franklin Lakes, New Jersey 07417.

18        8.    BD is a medical technology company that serves healthcare institutions, life science

19  researchers, clinical laboratories, industry, and the general public.  BD manufactures and sells a broad

20  range of medical supplies, devices, laboratory equipment, and diagnostic products.  BD has offices

21  in approximately 50 countries worldwide.

22        9.    Defendant Cytek Biosciences Inc. is a Delaware corporation with its principal place

23  of business located at 46107 Landing Pkwy, Fremont, California 94538.

24        10.    Cytek manufactures components for its flow cytometer products in China.

25        11.    Yan is an individual currently residing in the State of California, whose last known

26  address is 2809 Elsnab Court, Pleasanton, California 94588.  BD employed Yan from approximately

27  January 23, 2006 until his departure on January 23, 2015.

28

COMPLAINT                                CASE NO. _____

12.    Cytek hired Yan shortly after his departure from BD, and Yan is presently employed as Cytek's Chief Technology Officer.

13.    Riley is an individual currently residing in the State of California, whose last known address is 2296 Sunny Vista Drive, San Jose, California 95128.  BD employed Riley from approximately June 1988 until his departure on January 10, 2015.

14.    Cytek hired Riley in or about February 2016, and Riley is presently employed at Cytek as a General Manager.

15.    Vrane is an individual currently residing in the State of California, whose last known address is 880 Nevada Avenue, San Jose, California 95125.  BD employed Vrane from approximately October 20, 1998 until his departure on April 20, 2015.

16.    Vrane is presently employed at Cytek as a mechanical or fluidics engineer.

17.    Zhang is an individual currently residing in the State of California, whose last known address is 3836 Dunford Way, Santa Clara, California 95051.  BD employed Zhang from approximately January 3, 2005 until his departure on April 25, 2015.

18.    Cytek hired Zhang in 2016, and Zhang is presently employed by Cytek as a software developer.

19.    Gong is an individual currently residing in the State of California, whose last known address is 3234 Silverland Drive, San Jose, California 95135.  BD employed Gong from approximately June 5, 2000 until his departure in May 2015.

20.    Cytek hired Gong in or about May 2015, and Gong is presently employed by Cytek as Director of Software Development.

21.    Zhong is an individual currently residing in the State of California, whose last known address is 501 Manhattan Place, San Jose, California 95136.  BD employed Zhong from approximately March 28, 2011 until his departure on January 18, 2016.

22.    Cytek hired Zhong in or about January 2016, and Zhong is presently employed by Cytek as its China Business Manager.

COMPLAINT                                                    CASE NO. _____

23.     Jaimes is an individual currently residing in the State of California, whose last known address is 1335 Montecito Ave., Apt. 18, Mountain View, California 94043.  BD employed Jaimes from approximately 2005 until her departure on April 30, 2015.

24.     Cytek hired Jaimes in or about July 2015, and Jaimes is presently employed by Cytek as an application specialist.

25.     Reinin is an individual currently residing in the State of California, whose last known address is 41 Dorchester Drive, Mountain View, California 94043.  BD employed Reinin from approximately October 15, 2007 until his departure on June 13, 2016.

26.     Cytek hired Reinin in or about July 2016, and Reinin is presently employed as Cytek's Director of Marketing.

27.     Shook is an individual currently residing in the State of California, whose last known address is 985 Vicar Lane, San Jose, California 95117.  BD employed Shook from approximately October 17, 2011 until her departure on October 18, 2016.

28.     Cytek hired Shook in or about November 2016, and Shook is presently employed by Cytek as a systems engineer.

## JURISDICTION AND VENUE

29.     Jurisdiction is based upon 28 U.S.C. § 1332(a)(2) in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

30.     Jurisdiction is also based on 28 U.S.C. § 1331 and BD's claims under 18 U.S.C. §§ 1836-39, *et seq.*, for misappropriation of trade secrets under the Defend Trade Secrets Act.

31.     This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367 over all other claims that do not arise under the Constitution, laws, or treaties of the United States because they involve a common nucleus of operative fact.

32.     Venue is proper within this district because, as set forth above, all Defendants reside in this Judicial District.  In addition, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this Judicial District.  Venue is therefore proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2).

33.     Intradistrict Assignment: Assignment to the San Jose Division of this Court is appropriate under Civil L.R. 3-2(c) and 3-2(e) because a substantial part of the events that give rise to Plaintiff's Complaint occurred in Santa Clara County, California.

## FACTUAL ALLEGATIONS

### A.     BD And Its Products and Services

34.     Founded in 1897 and headquartered in Franklin Lakes, New Jersey, BD employs more than 65,000 associates in approximately 50 countries throughout the world.  BD is among the world's leading suppliers of medical devices and a leading innovator in injection- and infusion-based drug delivery, and has been since 1906, when the Company built the first-ever facility in the U.S. to manufacture needles and syringes.

35.     BD, with its overarching vision to improve outcomes for patients, focuses its business on improving drug delivery, enhancing the quality and speed of diagnosing infectious diseases and cancers, and advancing research, discovery, and production of new drugs and vaccines.  BD's capabilities are instrumental in combating many of the world's most pressing diseases by identifying and developing next-generation *in vitro* diagnostic technologies for settings ranging from hospital clinical labs to fields with minimal healthcare infrastructure.  As part of its development efforts, BD broadly looks at novel sample processing and detection technologies that help speed results, reduce cost, increase accuracy, and provide new types of clinically actionable information.  BD serves healthcare institutions, life science researchers, clinical laboratories, the pharmaceutical industry, and the general public.  Home-grown innovation has been critical to BD's innovation and competitive advantages.

36.     Through its BD Biosciences ("BDB") business unit, BD provides continuous advancement in the science and applications associated with cellular analysis and products that help grow living cells and tissue.  Among other products, BDB focuses on research, development, and production of flow cytometers.  BDB employs approximately 1,100 associates in its San Jose location (the "San Jose Facility"), which has primary responsibility for Research and Development ("R&D"), marketing, sales, finance, and customer service for flow cytometers, including but not limited to instruments, reagents, cell culture, and applications.

COMPLAINT                                                    CASE NO. _____

**B.** **Flow Cytometry**

37. Flow cytometry is a laser-based, biophysical technology that is employed in cell counting, cell sorting, biomarker detection, and protein engineering. A flow cytometer suspends cells with fluorescent labels ("dyes") in a stream of fluid and passes them individually past one or more lasers and optical detection circuitry. The resulting fluorescence is detected and measured to determine various properties of the cells, which can in turn provide critical information about human diseases and health.

38. Flow cytometry is widely used for medical diagnoses, research, clinical practice, and clinical trials. It has been used successfully to diagnose and classify certain cancers, including certain cancers in the blood, such as leukemia, and to evaluate the risk of recurrence, and as part of stem cell transplantation. Flow cytometry is a powerful research tool used for a wide variety of research purposes including cancer research, immune function research, and other forms of cellular analysis.

39. The properties measured in flow cytometry include the relative size of a particle, as well as its relative granularity or internal complexity, and relative fluorescence intensity. These characteristics are determined using an optical-to-electronic coupling system that records how the cell or particle scatters incident laser light and emits fluorescence.

40. The first fluorescence-based flow cytometry device was developed in 1968, and in 1974, BD introduced the first commercial flow cytometer. BD has received significant industry praise for its excellence in the flow cytometry space, including Life Science Industry Awards for Best New Product in Cellular Research and similar awards in multiple years, as well as over 100 U.S. patents related to flow cytometry.

41. Development of new flow cytometers often requires years of R&D and hundreds of thousands or millions of dollars. Flow cytometry involves multiple scientific disciplines, including physics, chemistry, biology, fluidics, optics, electrical engineering, and computer science.

42. A flow cytometer includes four main systems: fluidics, optics, electronics, and software.

43.     The fluidics system of a flow cytometer is responsible for transporting the sample from the sample tube to the flow cell surrounded by sheath fluid, which centers the cells in the flow cell and past the laser and detector.

44.     The optics system consists of lasers to illuminate the particles in the sample stream and optical filters to direct the resulting light signals to the appropriate detectors.

45.     The electronics system converts the detected light signals into electronic signals that can be processed by a computer.

46.     The software systems include algorithms for setting up a flow cytometer and for processing and interpreting the resulting data.  This includes algorithms related to panel design, which involves the proper choice of dyes to produce reliable data.

47.     In a flow cytometer, when cells pass through the laser intercepts, they scatter laser light, and any fluorescent molecules on the cells fluoresce.  The scattered and fluorescent light is collected by appropriately positioned lenses.  A combination of beam splitters and filters steers the scattered and fluorescent light to the appropriate detectors, and the detectors produce electronic signals proportional to the optical signals striking them.  Data are collected on each particle or event, and stored in the computer.  The characteristics or parameters of each event are based on its light scattering and fluorescent properties.  This data can then be analyzed to provide information about subpopulations within the sample.

48.     In spectral flow cytometry, the fluorescent light is sent to a spectrograph in which the light signal is dispersed and measured as a spectrum on the multichannel detector.  Spectral flow cytometry distinguishes the shapes of emission spectra along a large range of continuous wavelengths.  The data is analyzed with an algorithm that replaces compensation matrices and treats auto-fluorescence as an independent parameter.

## C.     BD's Flow Cytometers

49.     BD currently makes and sells multiple lines of flow cytometers and associated products.   These include the BD FACSLyric™, BD Accuri™, BD FACSCelesta™, BD LSRFortessa™, and BD FACSymphony™ lines of flow cytometers.   For decades, BD's flow

COMPLAINT                                          CASE NO. _____

cytometer products have been on the cutting edge of innovation, highly successful and reputable, and are sought after for their quality and reliability.

50.     BD uses confidential code in the software that its customers use to run its flow cytometers, as well as confidential algorithms for panel design.  This code provides control over the cytometer's hardware, which in turn carries out the actual functions of the flow cytometer.  This confidential code instructs the cytometer how to function, thus performing control, monitoring, and data manipulation functions of the cytometer.

51.     In roughly 2012, BD initiated a confidential project aimed at developing a flow cytometer with spectral analysis capabilities.  This project was known internally as "Project Newton."

52.     BD invested significant resources in Project Newton, including multiple years of research, financial investment, and substantial personnel time.  BD developed a working prototype, including a processing algorithm that allowed it to produce test results.

53.     The R&D related to this potential spectral flow cytometer involved new and confidential technology, including advances related to panel selection and development, fluidics, spectral unmixing, and new software code.

54.     As a BD Principal Engineer and leader of the spectral flow cytometry project, Defendant Yan played an integral part in BD's research and development of this new project to develop a flow cytometer with spectral analysis.  Yan had access to BD's confidential R&D information regarding BD's confidential project aimed at developing a flow cytometer with spectral analysis capabilities, including but not limited to design drawings, prototypes, and fluidics design details.  Yan was central to Project Newton since its inception and spent approximately two years working on it.

55.     At least four other Individual Defendants, including Vrane, Gong, Zhong, and Jaimes, worked on Project Newton under Yan's direction and had access to BD's confidential R&D information, including but not limited to design drawings, prototypes, software code, and fluidics design details.

-10-

56.    The other Individual Defendants, including Riley, Zhang, and Shook, worked on other confidential and proprietary BD flow cytometry development projects and had access to additional confidential and proprietary R&D information, including but not limited to design drawings, prototypes, software code, and fluidics design details.

57.    All of the Individual Defendants also worked on BD flow cytometer products aside from Project Newton, which also involved BD's confidential, proprietary, and trade secret information.

58.    All BD technical data, design data, and specifications related to its cytometers are confidential and proprietary BD information, and include BD trade secrets.

59.    The formulations, manufacturing formulas, development programs, development methods, code, and test results related to BD's cytometers are confidential and proprietary, and include BD trade secrets.

60.    The business plans, prototypes, design histories, formulas, fluidics design details, and test results related to Project Newton are confidential and proprietary, and include BD trade secrets.

61.    Examples of confidential and proprietary information related to Project Newton and other BD flow cytometry products include:

a.    Specifications for beads and dyes used to calibrate flow cytometers, including the quantities of dyes and parameters for calibration;

b.    Design specifications for code for BD's Accuri$^{TM}$ line of flow cytometer products;

c.    Communications protocol specifications that describe how BD's flow cytometer products communicate with personal computers;

d.    Design specifications for fluidics source code, including command sets for BD's confidential and proprietary spectral flow cytometer prototype relating to the fluidics system;

e.    Designs for vacuum-based fluidics systems;

f.    Panel design for choosing reagents and dyes that optimize cytometer data;

g.    Matlab source code for modeling a cytometer; and

-11-

h.      Data files showing spectral information for certain fluorochromes.

62.     As a result of their positions with BD in its San Jose Facility, the Individual Defendants had access to BD's design, specifications, manufacturing plans, materials, processes, equipment, and customer lists for all products in which the San Jose Facility maintains responsibility, including BD's cytometer products.

63.     All of the confidential information relating to BD's cytometer products and Project Newton was developed by BD in the course of its business at significant time, effort, and expense.

64.     BD's confidential and proprietary information—including, notably, information contained in the files taken by Individual Defendants—is not generally known outside of BD.

65.     BD's competitive position rests on continually enhancing product development and on a strong and consistent R&D approach founded on confidentiality and protection of intellectual property in a highly competitive field.

**D.      BD's Efforts To Protect Confidential Information**

66.     BD has expended significant amounts of time, effort, and money to preserve and maintain the secrecy of its confidential, proprietary, and trade secret information, including through policies, procedures, training programs, and systems that protect its information from disclosure to others and from use by any one for purposes other than BD's interest.

67.     BD employees execute an Employee Agreement with BD, establishing the employee's responsibility regarding BD's trade secrets and confidential information.

68.     At least Individual Defendants Yan, Vrane, Zhang, Gong, Zhong, Jaimes, and Shook executed an Employee Agreement.  As such, all of these Individual Defendants were aware that they were bound by such an agreement.  In addition to other corporate policies, Defendant Riley also had an acknowledged duty to avoid disclosing or misusing BD's trade secrets and confidential information.

69.     BD has policies and procedures concerning information and data security that stated, in relevant part, that only the software provided and installed by BD was allowed on employee computers, and that data and information on the BD Information System Network are proprietary and confidential.

**COMPLAINT**                                              **CASE NO.** _____

70.     BD employees are reminded of these policies when they sign into the BD system, as reflected in messages such as this one:

> **You are about to enter a private network intended for the authorized use of Becton, Dickinson and Company and its affiliates ("BD") for business purposes. The actual or attempted unauthorized access, use, or modification of this network is prohibited by BD.   Unauthorized users and/or unauthorized use may be subject to BD disciplinary proceedings and/or criminal and civil penalties in accordance with applicable law.   The use of this system may be monitored and/or recorded for administrative and security reasons in accordance with applicable law and policies. If such monitoring and/or recording reveals possible evidence of criminal activity, BD may provide the monitored evidence of such activity to law enforcement officials. Authorized use of this network is subject to BD policies and procedures including the Acceptable Use Policy.**

71.     To the extent that confidential information existed in written paper form, such writings were kept in secured areas with limited access.

72.     Guests to any BD facility, including the San Jose Facility, are not allowed to venture unescorted into such secure areas or access BD Confidential Information unless they or their employer had executed appropriate non-disclosure agreements with BD.

73.     BD maintains a Code of Conduct (the "Code") and has required all associates, including the Individual Defendants, to participate each year in training pertaining to the Code. Complying with the Code is a condition of employment with BD, and "[a]ll directors, officers and employees are responsible for complying with the Code."  The Code prohibits BD employees from, among other things, using BD Information Technologies to engage in the unauthorized access to data, using "personal email or file services to conduct BD business[,]" downloading or installing software that is not approved by BD, or using "hostage or storage services that have not been approved by BD Information Security[.]"

**E.      The Individual Defendants' Employment With BD**

74.     On or about January 23, 2006, BD hired Yan as a Principal Engineer in R&D.

75.     While employed by BD, Yan's primary responsibilities included working on BD's flow cytometers and R&D projects related to flow cytometry and other products.  Yan also headed Project Newton.   He oversaw numerous engineers and developers on this project, including Defendants Vrane, Gong, Zhong, and Jaimes, and dedicated approximately two years to this project.

1      76.     In 2014, BD elected to prioritize several other promising confidential projects over

2   Project Newton.  Afterwards, Yan departed BD on January 16, 2015 and joined Cytek shortly

3   thereafter.

4      77.     Before commencing employment at Cytek and while still employed at BD, Yan

5   downloaded at least 17,000 files to multiple separate removable media devices (one of the devices

6   included in it a compressed or encrypted folder in a foreign language (Chinese)[1]), and such files

7   included (i) design detail information and specifications regarding the BD Accuri™ code; (ii) source

8   code relating to BD's flow cytometry systems; (iii) testing information related to BD's flow

9   cytometry systems; (iv) prototypes relating to BD's confidential program to develop a spectral

10  cytometer; (v) design detail information and command settings for code relating to BD's confidential

11  program to develop a spectral cytometer; and (vi) confidential code information relating to BD's

12  confidential program to develop a spectral cytometer.  After diligent efforts to locate the removable

13  media devices, including inquiries to Yan and Cytek, only one device has been found.

14     78.     After Yan left BD and joined Cytek, he proceeded to recruit BD's flow cytometry

15  engineers.

16     79.     Yan, along with Defendant Jaimes, worked directly on Cytek's Aurora™ flow

17  cytometer, and they unveiled it together at the June 2017 CYTO conference in Boston.

18     80.     On or about June 1988, BD hired Riley, whose position with BD before his departure

19  to Cytek was Senior Program Manager.  Based on his employment status at the time, he was not

20  required to sign an employment agreement.  Nevertheless, he accepted, and was subject to, a clear

21  duty to maintain the confidentiality of BD trade secrets and other confidential proprietary

22  information.

23     81.     While employed by BD, Riley's recent work primarily involved supporting several

24  confidential and proprietary BD projects related to flow cytometry, including one of BD's proprietary

25  clinical cytometer projects as well as a proprietary BD clinical analyzer project.

26

27

---

28  [1] BD has recovered one of the devices to which Yan downloaded BD information.  However, the device BD recovered does not contain the compressed or encrypted folder in a foreign language.

**COMPLAINT**                                                          **CASE NO. _____**

82.     Riley departed BD on January 10, 2015, and he joined Cytek in approximately February 2016.

83.     Before commencing employment at Cytek and while still employed at BD, Riley downloaded multiple files to one or more removable media device, and such files included those related to R&D of clinical cytometry and analysis such as (i) design review templates and (ii) master project schedules.

84.     Following the termination of BD's spectral flow cytometry project and the departures of Yan and Riley shortly thereafter, both Yan and Riley proceeded to recruit from BD's ranks in its flow cytometry space, encouraging them to leave BD and join Cytek.

85.     On or about October 20, 1998, BD hired Vrane, whose position with BD before his departure to Cytek was in the R&D position of Senior Staff Engineer.

86.     While employed by BD, Vrane worked as a fluidics engineer on BD's spectral flow cytometry project overseen by Yan, as well as on several confidential and proprietary BD projects related to flow cytometry, including a proprietary clinical cytometer project, a proprietary BD clinical analyzer project, and a proprietary BD sorter project.  Shortly before leaving BD, Vrane worked on BD's proprietary vacuum fluidics subsystem for flow cytometers.

87.     Vrane departed BD on April 20, 2015, and he joined Cytek soon after.

88.     Before commencing employment at Cytek and while still employed at BD, Vrane downloaded multiple files to one or more separate removable media devices, and such files included those related to R&D design and development of BD's spectral cytometry, clinical cytometry, and sorting such as (i) fluidics design files and (ii) mode table files.

89.     Vrane is presently employed by Cytek as a mechanical or fluidics engineer.

90.     On or about July 2005, BD hired Jaimes, whose position with BD before her departure to Cytek was Scientist.

91.     While employed by BD, Jaimes worked on Project Newton, as well as other confidential R&D projects.

92.     Before commencing employment at Cytek and while still employed at BD, Jaimes downloaded multiple files to one or more removable media devices.

-15-

93.     Jaimes departed BD in April, 2015, and she joined Cytek in July 2015.

94.     On or about January 3, 2005, BD hired Zhang, whose position with BD before his departure to Cytek was Software Developer.

95.     While employed by BD, Zhang's primary responsibilities included working on various flow cytometry projects.

96.     Zhang departed BD on April 25, 2015, and he joined Cytek in 2016.

97.     Before commencing employment at Cytek and while still employed at BD, Zhang downloaded source code files to one or more removable media devices.

98.     Zhang is presently employed by Cytek as a software developer.

99.     On or about June 5, 2000, BD hired Gong, whose position with BD before his departure to Cytek was in the R&D position of Staff Engineer.

100.    While employed by BD, Gong's primary responsibilities included working on software development for BD's proprietary spectral flow cytometry project overseen by Yan, as well as software development relating to several additional confidential and proprietary BD flow cytometry projects, including that relating to BD's proprietary and confidential cytometer panel design.

101.    Gong departed BD in May 2015, and he joined Cytek that same month.

102.    Before commencing employment at Cytek and while still employed at BD, Gong downloaded multiple files to one or more separate removable media devices, and such files included those related to R&D design and development of BD's spectral cytometry software and cytometer panel design software such as (i) software design files and (ii) panel specification files.

103.    Gong is presently employed by Cytek as Director of Software Development.

104.    On or about March 28, 2011, BD hired Zhong, whose position with BD before his departure to Cytek was in the R&D position of Engineer II.

105.    While employed by BD, Zhong's primary responsibilities included work as a systems engineer on BD's proprietary spectral flow cytometry project overseen by Yan, as well as on another confidential and proprietary BD clinical cytometer project.

106.    Zhong departed BD in January 2016, and he joined Cytek that same month.

COMPLAINT                                                          CASE NO. _____

107.     Before commencing employment at Cytek and while still employed at BD, Zhong downloaded multiple files to one or more separate removable media devices, and such files included those related to R&D design, development, and experimentation of BD's spectral cytometry and clinical cytometry, such as (i) spectral cytometry experiment files and (ii) experimental data.

108.     Zhong is presently employed by Cytek as China Business Manager.

109.     On or about October 17, 2011, BD hired Shook, whose position with BD before her departure to Cytek was in the R&D position of Senior Project Engineer.

110.     While employed by BD, Shook worked on several proprietary and confidential BD projects related to flow cytometry, including two proprietary clinical cytometer projects, a proprietary analyzer project, and a proprietary sorter project.

111.     Shook departed BD in October 2016, and she joined Cytek the following month, in November 2016.

112.     Before commencing employment at Cytek and while still employed at BD, Shook downloaded multiple files to one or more separate removable media devices, and such files included those related to R&D design, development, and experimentation of BD's clinical cytometry, analysis, and sorting such as (i) CAD drawings; (ii) design review summaries; and (iii) experimentation files.  Shook took these devices with her when she left BD and has not returned them.

113.     Shook is presently employed by Cytek as a Systems Engineer.

114.     Upon Cytek's hiring of the Individual Defendants, Defendant Cytek knew or should have known that Defendants Yan, Vrane, Zhang, Gong, Zhong, Jaimes, and/or Shook was subject to an Employment Agreement under his or her former employer, BD.

**F.     The Individual Defendants' Responsibilities to BD**

115.     Together, the Individual Defendants possess decades of knowledge of BD's confidential, proprietary, and trade secret information relating to the development of BD's flow cytometry products.

116.     As employees of BD, the Individual Defendants other than Riley executed an Employee Agreement (the "Agreement") that set forth obligations that the Individual Defendants

had as employees concerning, among other things, confidential information, technology and trade secrets. Each Agreement sets forth the same or substantially the same terms.

117.   Upon signing the Agreements, the Individual Defendants agreed that they were prohibited from using, outside the scope of their employment, any BD confidential information, including "any confidential or unpublished information, business plan, financial information, trade secret, computer program, design, product, process, procedure, formula, research, improvement, work of authorship, or the like, whether of a technical or non-technical nature," relating to BD's business.

118.   The Individual Defendants further agreed that upon leaving BD, they would promptly return all BD property, "including such things as drawings, manuals, notebooks, reports, customer and vendor lists, all samples, all prototypes, all demos, and like material, and anything else owned by the Company or to which the Company is entitled and which is in my possession or under my control."

119.   The Individual Defendants also assigned, and agreed to assign, to BD all right, title, and interest in any innovations developed during the time of their employment or a period of one year after their employment.

120.   Each Employee Agreement is governed by New Jersey law.

121.   As a result of their position at BD, the Individual Defendants all had access to BD confidential information, including but not limited to BD's design, specifications, blueprints, manufacturing plans, materials, processes, technical information, marketing materials, and other information relating to BD's flow cytometers.

122.   Yan, Vrane, Gong, Zhong, and Jaimes also had access to BD's highly confidential design files, prototypes, software, and analyses regarding BD's R&D efforts in connection with a flow cytometer capable of spectral analysis.

123.   BD maintains a Trade Secret Policy to which the Individual Defendants had access during their employment. The Trade Secret Policy states in part:

4.3   *Examples of BD Trade Secrets*
BD trade secrets may include, but need not be limited to:

COMPLAINT                                      CASE NO. _____

(a)   Information relating to:

(i)   intellectual property such as unpublished patent, trademark or copyright applications, or invention disclosures;

(ii)  research and development activities and results such as formulas, prototypes, processes, laboratory notebooks, experiments and experimental data, analytical data, calculations, drawings, vendor/supplier information, reports, know-how and negative know-how (i.e., what does not work), new product development, clinical study protocols, results and associated data.

-------------------------------------------------------------------------------------------------------

(e)   <u>BD Associates</u> – BD trade secrets should be made available to BD associates on a "need to know" basis only.  BD associates should treat all non-public information about BD as a BD trade secret unless otherwise instructed.

124.   The Trade Secret Policy also states that "Every BD associate with access to BD trade secrets shall comply with this Policy."

125.   During their employment at BD, the Individual Defendants had access to paper, computer, and other files that had R&D information concerning a number of various and ongoing projects, including but not limited to non-public, confidential information and trade secrets concerning BD's flow cytometers.

126.   BD issued to each of the Individual Defendants a laptop computer and provided each with access to BD's network files and hard copy files.  Network files include specific product information, technical reports, and project lists.  Hard copy files include all product designs, manufacturing instructions, quality control specifications, and chemical characteristics.

127.   The information to which the Individual Defendants had access was confidential and proprietary and constituted trade secrets under at least California, New Jersey, and federal law.

128.   In each of their roles at BD, the Individual Defendants routinely played a critical part in the various products and R&D projects relating to flow cytometry.  The technical and clinical designs, pictures, and drawings, design data, product and process developments, prototypes, marketing data and marketing studies, and other innovative information relating to each of these products or developing products is extremely confidential, has great value to BD and would have significant economic value to its competitors.  If a competitor of BD were to learn of the designs, blueprints, and other innovative information relating to any of these products or developing products, it would cause BD great harm and put it at significant competitive disadvantage.

129.    Furthermore, the collective knowledge possessed by the Individual Defendants of BD's confidential, proprietary, and trade secret information would be exceptionally valuable to a competitor, and would cause BD great harm and put it at significant competitive disadvantage.

**G.      Cytek's Employment of the Individual Defendants and Recent Launch of Competitive Cytometers**

130.    Cytek was founded in the early 1990s by a former employee of BD as a service-oriented company providing service, upgrades, and technical support to flow cytometers developed by other companies, including BD.

131.    Cytek Biosciences Inc. is the outcome of a merger between Cytek Development Inc., and Cytoville Inc., a venture capital-backed business focused on advanced medical instrument technology development.  *See* https://www.biospace.com/article/releases/ cytek-biosciences-poised-to-accelerate-flow-cytometry-adoption-/, Mar. 29, 2017 (last viewed Feb. 3, 2018).

132.    Before approximately March 2017, Cytek continued in its original service-oriented role, and did not produce or sell any of its own cytometers.

133.    According to its current website, however, Cytek now consists of "engineers, scientists and customer service representatives who design, build and support flow cytometers."  *See* https://cytekbio.com/pages/about (last viewed Jan. 25, 2018).

134.    Also according to its current website, Cytek is now a "manufacturer and supplier of flow cytometry products and services."  *Id*.

135.    According to Cytek's website, Yan "is a co-founder of Cytek Biosciences, Inc.[,]" is on Cytek's Board of Directors, and is Cytek's Chief Technology Officer.  *Id*.

136.    The other Individual Defendants are all currently employed with Cytek as well.  A substantial number of Cytek's R&D positions, including senior management and technology positions, are held by former BD employees.

137.    On or about March 15, 2017, less than two years after Yan began employment with Cytek, Cytek launched its first flow cytometry system, the DxP Athena™ flow cytometry system. The DxP Athena™ is marketed and sold throughout the United States and worldwide.

COMPLAINT                                                    CASE NO. _____

138.   Less than three months after it launched the DxP Athena™ flow cytometry system, on or about June 7, 2017, Cytek launched another flow cytometry system, the Cytek Aurora™ flow cytometry system.   The Aurora™ shares striking similarities with the spectral flow cytometer previously in development at BD by Yan and other Individual Defendants, as well as other BD products and technologies.   Specifically, the Cytek Aurora™ is a flow cytometer with spectral analysis capabilities similar to those that were in development at BD through Project Newton.   The Aurora™ is sold throughout the United States and worldwide.

139.   Since 2016, Cytek has filed patent applications directed to technologies relating to spectral flow cytometry, including published applications with Yan and Vrane as named inventors.

140.   Use of BD's confidential, proprietary, and trade secret information held by the Individual Defendants and contained in the files they misappropriated would have greatly helped Cytek bring its DxP Athena™ and Aurora™ flow cytometry systems to market.   That information would have given Cytek an unfair advantage and head start in developing their own flow cytometer products.

141.   Cytek used BD's confidential, proprietary, and trade secret information as part of its effort to develop and market flow cytometry systems, including but not limited to, the DxP Athena™ flow cytometry system and the Aurora™ flow cytometry system, to the detriment of BD.

**H.**   **The Theft Of Confidential Information And Trade Secrets From BD and Systemic Departure of Employees From BD To Cytek**

142.   In January 2018, having learned from public information that several BD employees had left BD's employ and accepted employment with Cytek after being specifically targeted and recruited, BD initiated an ongoing internal review.   As a result of the internal review, BD learned that the Individual Defendants had downloaded thousands of files to dozens of removable media devices containing BD confidential and proprietary information and trade secrets while still employed at BD.

143.   BD engaged in efforts to recover the missing devices, including but not limited to: (a) making written demands to certain Individual Defendants for the immediate return of the devices; (b) conducting a search of the BD San Jose Facility for the devices; and (c) requesting that Cytek

assist BD with recovering the devices from their current officer(s) and employees, preserve information related to the missing devices, and agree to a third-party forensic inspection.

144.    Of the dozens of devices to which the Individual Defendants downloaded BD confidential information, to date BD has been able to recover only a handful of devices.

145.    BD's internal review revealed the downloading activity by the Individual Defendants described above.

146.    The Individual Defendants were in possession of the misappropriated trade secrets, as well as their individual and combined knowledge of BD's proprietary and confidential information related to BD's flow cytometry and spectral flow cytometry, when they joined Cytek and, on information and belief, used those trade secrets in their work there for the benefit of Cytek.

147.    With its improper access to and misuse of BD's confidential information, Cytek was able to develop and launch its own spectral flow cytometry products rapidly, having never before produced a flow cytometer product itself, its only prior experience being in servicing and refurbishing others' flow cytometers, including BD's.  Cytek would not have been able to develop flow cytometers on as rapid a time frame but for its wrongful use of BD's confidential information.

148.    After learning of Yan's conduct regarding BD's confidential information, BD contacted Cytek and asked that Cytek preserve any relevant information and agree to a third-party review of its computer systems for BD's confidential information.  After learning of the conduct of the other Individual Defendants regarding BD's confidential information, BD again contacted Cytek to reiterate the need for a third-party review.  BD also provided Cytek with information about the missing removable media devices.  To date, Cytek has not agreed to allow a third-party review of its computer systems.

149.    BD's confidential, proprietary, and trade secret information derives significant independent economic value, actual and/or potential, from not being generally known to the public or to other persons that can obtain economic value from their use or disclosure.  BD derives substantial business advantage and significant economic benefit from maintaining the confidentiality of its confidential, proprietary, and trade secret information.

150.   The Individual Defendants' improper disclosure to Cytek of BD's confidential, proprietary, and trade secret information, and Cytek's improper use of that information, has caused and will cause substantial economic harm and disadvantage to BD, some of which is not even known or knowable at the present time.

151.   BD has been injured by Defendants' conduct, including lost revenue, and other harms.

## FIRST CLAIM FOR RELIEF

**(Misappropriation/Threatened Misappropriation of Trade Secrets Under the Defend Trade Secrets Act of 2016)**
**(Against All Defendants)**

152.   BD repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

153.   BD owned and possessed information, documents, and data containing trade secrets, including, but not limited to, design detail information, design specifications, source code information, testing information, prototypes and designs of prototypes, command settings, and code, all as alleged herein.

154.   This trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce, including but not limited to:

    a.   Specifications for beads and dyes used to calibrate flow cytometers, including the quantities of dyes and parameters for calibration;

    b.   Design specifications for code for BD's Accuri$^{TM}$ line of flow cytometer products;

    c.   Communications protocol specifications that describe how BD's flow cytometer products communicate with personal computers;

    d.   Design specifications for fluidics source code, including command sets for BD's confidential and proprietary spectral flow cytometer prototype relating to the fluidics system;

    e.   Designs for vacuum-based fluidics systems;

      f.      Panel design for choosing reagents and dyes that optimize cytometer data;

      g.      Matlab source code for modeling a cytometer; and

      h.      Data files showing spectral information for certain fluorochromes (collectively, "the BD Trade Secrets").

155.   At all times, BD has taken reasonable and extensive measures to keep secret its trade secrets and confidential information, including the BD Trade Secrets, including but not limited to limiting access to confidential information, requiring non-exempt employees to sign Employee Agreements, implementing employment policies (including the BD Trade Secret Policy) that require confidentiality, and reminding BD employees (including all of the Individual Defendants) of their responsibilities when logging into the BD network.

156.   This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  Since its founding, BD has invested and continues to invest millions of dollars into R&D and implementation of projects and products that make use of BD's confidential, proprietary, and trade secret information, including that of the BD Trade Secrets.

157.   The misappropriated BD Trade Secrets are crucial to the success of the implementation, operation, and maintenance of BD's proprietary cytometry technologies, and give a decisive competitive advantage to BD and, potentially, to anyone else with access to this information.

158.   At no time did BD consent to Defendants' use or disclosure of the BD Trade Secrets or any other BD trade secret or confidential information for any purpose.

159.   In violation of BD's rights, the Defendants misappropriated the confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein, within the meaning of the DTSA, 18 U.S.C. § 1836, by using and disclosing the BD Trade Secrets and continuing to use and disclose them for their own economic benefit.

COMPLAINT                              CASE NO. _____

160.    The Individual Defendants' misappropriation of the BD Trade Secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(C).

161.    The Individual Defendants have failed to return BD's confidential and trade secret information.

162.    By virtue of their employment by Cytek, the Individual Defendants had a duty not to reveal confidential information and trade secrets obtained during their employment by BD or to use such confidential information and trade secrets for their own benefit and to the detriment of BD.

163.    By virtue of BD's development and ownership of its confidential information and trade secrets, BD is entitled to the exclusive use and enjoyment of this information.

164.    In significant part, by engaging in the downloading of BD confidential information and trade secrets and not returning same to BD, the Individual Defendants have intentionally, willfully, and maliciously misappropriated, misused, revealed, and disclosed trade secrets and/or confidential information or knowledge of BD to Cytek, and continue or will continue to do so, in violation of a confidential relationship between BD and the Individual Defendants.

165.    By downloading and removing BD confidential information and trade secrets and not returning same to BD, the Individual Defendants have threatened and continue to threaten to disclose BD confidential information and trade secrets to Cytek in the performance of their duties to Cytek.

166.    Cytek either accepted such confidential information or trade secrets with knowledge that it was confidential information or trade secrets taken by the Individual Defendants in violation of their duty of confidentiality, or Cytek was deliberately indifferent or reckless in failing to prevent the Individual Defendants from using, disclosing, or misappropriating BD's confidential information or trade secrets.

167.    Further, Cytek possesses confidential information or trade secrets of BD from the Individual Defendants.

168.    If the Individual Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use for their own and Cytek's benefit and to BD's detriment, BD's trade secret information.

COMPLAINT                                                    CASE NO. _____

169.    As the direct and proximate result of Defendants' misappropriation as aforesaid, BD has suffered damage within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I) in an amount as yet unknown and, if Defendants' conduct is not stopped, BD will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

170.    In addition, Defendants have been unjustly enriched as a result their misappropriation of the BD Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(II) in an amount as yet unknown.

171.    Because BD's remedy at law is inadequate, BD seeks, in addition to damages, injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A)(i) to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.  BD's business relies on its reputation and ability to maintain and grow its client base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## SECOND CLAIM FOR RELIEF

### (Aiding and Abetting the Defend Trade Secrets Act of 2016)
### (Against All Defendants)

172.    BD repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

173.    BD owned and possessed the BD Trade Secrets, as alleged herein.

174.    The BD Trade Secrets are not generally known or readily ascertainable, nor could they be properly acquired or duplicated by others.

175.    At all times, BD has taken reasonable and extensive efforts to keep secret its trade secrets and confidential information, including the BD Trade Secrets.

176.    The BD Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  Since its founding, BD has invested and continues to invest millions of dollars into R&D and implementation of projects and products that make use of BD's confidential, proprietary, and trade secret information, including that of the BD Trade Secrets.

177.    The misappropriated BD Trade Secrets are crucial to the success of the implementation, operation, and maintenance of BD's proprietary cytometry technologies, and give a decisive competitive advantage to BD and, potentially, to anyone else with access to this information.

178.    At no time did BD consent to Defendants' use or disclosure of the BD Trade Secrets or any other BD trade secret or confidential information for any purpose.

179.    In violation of BD's rights, the Defendants misappropriated the confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein, within the meaning of the DTSA, 18 U.S.C. § 1836, by using and disclosing the BD Trade Secrets and continuing to use and disclose them for their own economic benefit.

180.    Defendants aided and abetted the misappropriation by the other Defendants of the BD Trade Secrets within the meaning of the DTSA, 18 U.S.C. § 1836, to the benefit of Cytek.

181.    As the direct and proximate result of Defendants' misappropriation as aforesaid, BD has suffered damage within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I) in an amount as yet unknown and, if Defendants' conduct is not stopped, BD will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

182.    Defendants willfully and maliciously misappropriated the BD Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(C).

183.    Defendants will continue to misappropriate the BD Trade Secrets, and BD will continue to suffer irreparable injury, unless Defendants' continued misappropriation is enjoined by this Court pursuant to 18 U.S.C. § 1836(b)(3)(A)(i).

## THIRD CLAIM FOR RELIEF

**(Misappropriation/Threatened Misappropriation of Trade Secrets Under the California Uniform Trade Secrets) (California Civil Code § 3426, et seq.)
(Against All Defendants)**

184.    BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

-27-

185.    BD owned and possessed confidential and proprietary documents and data containing trade secrets, including, but not limited to, design detail information, design specifications, source code information, testing information, prototypes and designs of prototypes, command settings, and code, all as alleged herein, including but not limited to the BD Trade Secrets.

186.    At all times, BD has taken reasonable and extensive measures to keep secret its trade secrets and confidential information, including the BD Trade Secrets, including but not limited to by limiting access to confidential information, requiring employees to sign Employee Agreements, implementing employment policies, including the BD Trade Secret Policy, that require confidentiality, and reminding BD employees, including all of the Individual Defendants, of their responsibilities when logging into the BD network.

187.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.  Since its founding, BD has invested and continues to invest millions of dollars into R&D and implementation of projects and products that make use of BD's confidential, proprietary, and trade secret information, including that of the BD Trade Secrets.

188.    The misappropriated BD Trade Secrets are crucial to the success of the implementation, operation, and maintenance of BD's proprietary cytometry technologies, and give a decisive competitive advantage to BD and, potentially, to anyone else with access to this information.

189.    At no time did BD consent to Defendants' use or disclosure of the BD Trade Secrets or any other BD trade secret or confidential information for any purpose.

190.    In violation of BD's rights at law and under contracts, the Individual Defendants misappropriated the trade secret data, documents, and information described herein by secretly downloading to external media devices before their departure from BD, by removing those devices from BD, and by taking other actions alleged herein.

191.    Defendants knew or should have known under the circumstances that the information misappropriated by Defendants was trade secret information.

COMPLAINT                                                    CASE NO. _____

192.     Defendants misappropriated BD's trade secrets by acquiring at least the BD Trade Secrets with knowledge of or reason to know that this information was acquired by improper means, and Defendants are using at least the BD Trade Secrets acquired by improper means without BD's knowledge or consent.

193.     Defendants threaten to further misappropriate trade secrets by acquiring at least the BD Trade Secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are threatening to use BD's trade secrets acquired by improper means without BD's knowledge or consent.

194.     As a direct and proximate result of Defendants' misappropriation as aforesaid, BD is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.  BD has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation.

195.     As a further proximate result of the misappropriation and use of BD's trade secrets, Defendants were unjustly enriched.

196.     The aforementioned acts of Defendants were willful, malicious and fraudulent.  BD is therefore entitled to exemplary damages under California Civil Code § 3426.3(c).

197.     Defendants' conduct constitutes transgressions of a continuing nature for which BD has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use BD's trade secret information to enrich themselves and divert business from BD.  Pursuant to California Civil Code § 3426.2, BD is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendants from using all trade secret information misappropriated from BD and to return all trade secret information to BD.

198.     Pursuant to California Civil Code § 3426.4 and related law, BD is entitled to an award of attorney's fees for Defendants' misappropriation of trade secrets.

///

///

///

COMPLAINT                                      CASE NO. _____

**FOURTH CLAIM FOR RELIEF**

**(Violation of California Unfair Competition Law)**
**(Against All Defendants)**

199. BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

200. Defendants knowingly performed acts to pirate away the fruits of BD's customer base, including, but not limited to: interfering with the prospective economic advantage BD has with its customers, deceiving the customers, diverting and attempting to divert the customers through use of trade secrets misappropriated from BD, and by engaging on other acts alleged herein. These acts constitute unlawful, unfair, and/or fraudulent business practices and unfair competition prohibited under California Business and Professions Code Sections 17200 *et seq.*

201. As alleged more fully above, Defendants took BD's technical and business information including but not limited to the BD Trade Secrets and other valuable information involving the design, business, and marketing of flow cytometers.

202. The Defendants have all benefited from these acts in the form of unfair advantages in developing, producing, and selling flow cytometers, as evidenced by Cytek's release of two competing flow cytometer products.

203. As a result of such acts, BD has suffered damage in an amount as yet unknown, and, if Defendants' conduct is not stopped, BD will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

204. As an additional result of such acts, BD has suffered, and will continue to suffer, irreparable harm by Defendants' unfair practices and unfair competition, including but not limited to its business reputation, good will, and stature, in the business community and with its customers, for which there is no adequate remedy at law, thereby justifying injunctive relief.

205. Until relief is granted to BD, BD will be harmed and Defendants will be unjustly enriched, which unjust enrichment should be disgorged pursuant to allowable remedies under California Business and Professions Code Sections 17200 *et seq.*

///

COMPLAINT                                                    CASE NO. _____

**FIFTH CLAIM FOR RELIEF**

**(Breach of Contract)**
**(Against Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook)**

206.    BD repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

207.    The Agreement, which Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook each knowingly and willingly entered into, is a valid and enforceable contract.

208.    Riley had a duty to avoid disclosing or misusing BD's trade secrets and confidential information.   Riley and BD entered into an express or implied-in-fact contractual employment relationship, in which Riley agreed to BD's restrictions on such information.

209.    During their employment with BD, Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook had access to and were exposed to BD confidential, proprietary, and trade secret information.

210.    Knowledge of BD's confidential, proprietary, and trade secret information by Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook provided them with an unfair direct competitive advantage vis-à-vis BD.

211.    BD at all times performed its contractual duties under the Employment Agreements and any other implied contract formed through its employment of Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook.

212.    BD has a legitimate protectable interest in its confidential, proprietary, and trade secret information, and in preventing former employees from using such information to the detriment of BD.

213.    The downloading and removal of BD confidential and trade secret information by Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook violated their obligation in the Agreement to return all of BD's property at termination, regardless of the format of such property.

214.    As a direct, foreseeable, and proximate result of the breach of their Agreement by Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook, BD has been and/or will be damaged

1    in that it has lost or will lose revenue that it would have received but for their breach of the

2    Agreement, and BD has suffered or will suffer harm due to Yan's breach.

3                              **SIXTH CLAIM FOR RELIEF**

4                    **(Breach of Implied Covenant of Good Faith and Fair Dealing)**
5                    **(Against Riley, Yan, Vrane, Zhang, Gong, Zhong, Reinin, and Shook)**

6         215.    BD repeats the preceding allegations and incorporates the same herein as if set forth

7    in detail.

8         216.    The Agreements contain an implied covenant by the parties to act in good faith and

9    deal fairly with each other.

10        217.    By taking and remaining in possession of BD confidential information from BD, Yan,

11   Vrane, Zhang, Gong, Zhong, Jaimes, Reinin, and Shook violated, and continue to violate, the

12   Agreement's implied covenant of good faith and fair dealing by frustrating BD's rights to benefit

13   from this Agreement.

14        218.    As explained above, Riley and BD entered into an express or implied-in-fact

15   contractual employment relationship, with an implied covenant to act in good faith and deal fairly

16   with each other.

17        219.    This breach of the implied covenant of good faith and fair dealing has caused, and

18   will continue to cause, BD to suffer substantial monetary damages, in an amount to be determined at

19   trial, as well as monetary damages that cannot be calculated, and irreparable harm to its reputation

20   and goodwill.

21                             **SEVENTH CLAIM FOR RELIEF**

22                              **(Inducing Breach of Contract)**
23                                **(Against Cytek and Yan)**

24        220.    BD repeats the preceding allegations and incorporates the same herein as if set forth

25   in detail.

26        221.    There were contracts between BD and Vrane, Zhang, Gong, Zhong, Jaimes, Reinin,

27   and Shook, each of whom executed an Agreement.

28        222.    Cytek and Yan knew that these contracts existed.

-32-

| COMPLAINT | CASE NO. _____ |

223.    Cytek and Yan intended to cause one or more of Vrane, Zhang, Gong, Zhong, Jaimes, Reinin, and Shook to breach their contracts with BD by misusing BD's confidential information in violation of the Agreements.

224.    Cytek and Yan caused one or more of Vrane, Zhang, Gong, Zhong, Jaimes, Reinin, and Shook to breach their contracts with BD by hiring them away from BD to work on Cytek's flow cytometry products, using BD's confidential information.

225.    BD has suffered and continues to suffer significant harm from the breach of its contracts with its former employees.

226.    Cytek and Yan's conduct was a substantial factor in causing harm to BD.

### EIGHTH CLAIM FOR RELIEF

**(Unjust Enrichment)**
**(Against All Defendants)**

227.    BD repeats the preceding allegations and incorporates the same herein as if set forth in detail.

228.    Defendants have been enriched by the taking, retaining, and misuse of BD's confidential, proprietary, and trade secret information, including the R&D work for BD's spectral flow cytometry project.

229.    As a result of Defendants' acts, Cytek was able to develop and release two flow cytometers—one of which bears striking similarities to the BD spectral flow cytometer in development by Yan and other Individual Defendants—in a rapid time period, thanks to the benefit of the BD confidential, proprietary, and trade secret information gained from the Individual Defendants.

230.    Defendants' enrichment was at BD's expense.

231.    Under the circumstances, equity and good conscience dictate that Defendants should pay restitution to BD.

232.    Defendants have been unjustly enriched.

///

///

**NINTH CLAIM FOR RELIEF**

**(Breach of Confidence)**
**(Against All Defendants)**

233.    BD repeats the preceding allegations and incorporates the same herein as if set forth in detail.

234.    BD possessed confidential and proprietary information and know-how relating to the R&D of its flow cytometry products, including that of BD's spectral flow cytometry project.  BD's proprietary information was not generally known in the industry, was not generally known by BD's own employees who did not require access to such information during the course of their everyday activities, was reasonably protected by BD, is valuable to both BD's and Cytek's business, was the product of significant effort and expense, and is not easily acquired or duplicated.

235.    Defendants have misused BD's confidential and proprietary information in breach of confidentiality obligations and/or as a result of discovery by improper means by the development, sale, marketing, distribution and maintenance of Cytek's DxP Athena™ flow cytometry system and Cytek's Aurora™ spectral flow cytometry system, including in the United States.

236.    Defendants' unauthorized conduct constitutes breach of confidence.

**TENTH CLAIM FOR RELIEF**

**(Common Law Conversion)**
**(Against All Defendants)**

237.    BD repeats the preceding allegations and incorporates the same herein as if set forth in detail.

238.    BD owned and possessed removable media devices, papers, and/or notebooks containing confidential and proprietary information, documents, files, and data including but not limited to knowledge and know-how regarding BD's confidential and proprietary flow cytometry projects, drawings, manuals, notebooks, reports, customer and vendor lists, samples, prototypes, and demos.

239.    Defendants have intentionally and unlawfully exercised dominion over BD's property, including but not limited to, its removable media devices, papers, and/or notebooks

-34-

| COMPLAINT | CASE NO. _____ |

1   containing confidential and proprietary information, by both the transfer of thousands of files relating

2   to BD confidential and proprietary flow cytometry projects, and by the departure *en masse* of the

3   Individual Defendants from BD to Cytek, along with significant knowledge and know-how regarding

4   BD's confidential and proprietary flow cytometry projects.

5        240.    Defendants' conduct constitutes a conversion of BD's property contrary to California

6   law.

7        241.    Defendants' acts of conversion were committed willfully, knowingly, maliciously,

8   and in conscious disregard of his legal obligations to BD.

9        242.    As a result of such acts, BD has suffered damage in an amount as yet unknown, and,

10  if Defendants' conduct is not stopped, BD will continue to suffer irreparable injury and significant

11  damages, in an amount to be proven at trial.

12

13       **WHEREFORE**, BD prays for judgment against Defendants as follows:

14       1.    A permanent injunction against Defendants enjoining them from using BD's

15  confidential and proprietary information, directing return of all of BD's property, and enjoining the

16  sale of any cytometer product that incorporates or was otherwise derived from BD's confidential

17  information;

18       2.    An order compelling Defendants to have an independent forensic expert review

19  Defendants' computer systems, including any and all e-mail or cloud storage accounts, and identify

20  and delete any BD confidential information;

21       3.    All compensatory damages pled and proved;

22       4.    Attorneys' fees and costs in the suit herein;

23       5.    Punitive damages in favor of BD and against Defendants;

24       6.    Pre-judgment and post-judgment interest; and

25       7.    Such other and further relief as to this Court may seem just and proper.

26  ///

27  ///

28  ///

| COMPLAINT | CASE NO. _____ |

1

Respectfully submitted,

2

3    Date: February 13, 2018           By: */s/ James R. Batchelder*

4                                       James R. Batchelder
                                        David S. Chun
5                                       Henry Y. Huang
                                        **ROPES & GRAY LLP**
6                                       1900 University Ave. Sixth Floor
                                        East Palo Alto, CA 94303-2284
7                                       james.batchelder@ropesgray.com
                                        david.chun@ropesgray.com
8                                       henry.huang@ropesgray.com

9                                       Peter M. Brody
                                        **ROPES & GRAY LLP**
10                                      2099 Pennsylvania Ave. NW
                                        Washington, DC 20006-6807
11                                      peter.brody@ropesgray.com

12                                      *Attorneys for Plaintiff,*
                                        *BECTON, DICKINSON AND COMPANY*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                          CASE NO. _____