1   COOLEY LLP
    STEPHEN C. NEAL (170085) (sneal@cooley.com)
2   JEFFREY S. KARR (186372) (jkarr@cooley.com)
    DANE R. VORIS (281051) (dvoris@cooley.com)
3   3175 Hanover Street
    Palo Alto, CA  94304-1130
4   Telephone:   (650) 843-5000
    Facsimile:    (650) 849-7400
5
    MARTIN S. SCHENKER (109828) (mschenker@cooley.com)
6   101 California Street, 5th Floor
    San Francisco, CA 94111-5800
7   Telephone:   (415) 693-2000
    Facsimile:    (415) 693-2222
8
    Attorneys for Defendant and Counterclaimant
9   Cytek Biosciences Inc.

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  BECTON, DICKINSON AND COMPANY,        Case No.  3:18-cv-00933 MMC

15                    Plaintiff and Counterclaim-   **CYTEK BIOSCIENCES INC.'S FIRST**
                      Defendant,                    **AMENDED COUNTERCLAIMS AGAINST**
16                                                  **BECTON, DICKINSON AND COMPANY**

17         v.

18  CYTEK BIOSCIENCES INC., MING YAN,
    ALFRED RILEY, DAVID VRANE,               **DEMAND FOR JURY TRIAL**
19  ZHENYU ZHANG, ZHENXIANG GONG,
    ALEX ZHONG, MARIA JAIMES, GIL
20  REINEN, AND JANELLE SHOOK,

21                    Defendants and
                      Counterclaimants.
22

23

24

25        **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

26

27

28

## **FIRST AMENDED COUNTERCLAIMS**

Cytek Biosciences Inc. ("Cytek"), by and through its undersigned counsel, alleges the following counterclaims against Becton, Dickinson and Company ("BD") on information and belief:

### **PRELIMINARY STATEMENT**

1.     This case is about an established market leader's improper interference with an upstart competitor's business in the flow cytometry market.  Flow cytometry is a powerful, laser-based technology used for identifying and quantifying cellular characteristics on a cell-by-cell basis that offers a variety of biomedical and therapeutic applications, including investigation of the immune system's role in combating cancer, and the diagnosis of leukemia and lymphoma.  For years, BD has held a dominant market share in the flow cytometry market.

2.     Cytek is an emerging provider of flow cytometry products and services in the United States.  Headquartered in Fremont, California, Cytek serves more than 500 customer-clients, including top tier research institutions, government agencies, medical schools, and private and public companies. Over the last two years, Cytek has released two flow cytometer platforms to the market—the first employing existing technology that Cytek leadership developed over decades of experience in the field, and the second based on an advanced technology called spectral flow cytometry, which Cytek combined for the first time ever with innovations from the telecommunications industry.  BD, which dominates more than half the United States market for flow cytometers, admittedly has no similar spectral flow cytometer offering.  Cytek's spectral flow cytometer, marketed under the product name Aurora, has been very successful since its launch, but not as successful as it should be because of BD's improper and unfair interference with Cytek's potential customers.

3.     After Cytek introduced its Aurora product, BD focused its attention on Cytek.  ██████ ████████████████████████████████████████████████████████████████████████ ███████████████████   BD pursued a different strategy—interfering with Cytek's business.  BD has warned potential Cytek customers that, should they purchase an Aurora machine, BD would refuse to supply them with the essential reagents necessary to operate the customers' existing  machines—a threat that, if carried out, would render these expensive machines substantially impaired.  Thus, BD *tied* the sale of cytometer reagents to its customers' refusal to purchase a competing machine from

1.

Cytek.  Anti-competitive tying arrangements such as this are prohibited by federal and California law.

4.      BD then filed this lawsuit against Cytek and nine former BD employees (the "Individual Defendants")[1] complaining of alleged trade secret misappropriation, employee "poaching," and violation of restrictive employee covenants.  Among other things, BD claimed that its former employees—who left BD for their own reasons and joined Cytek over a period of nearly two years—breached assignment, or "holdover," provisions in their BD employee agreements when they failed to turn over innovations developed *after* leaving BD.  These restrictive employment provisions, which harm both former employees and future employers like Cytek, are illegal under California law, and cannot be enforced by BD.

5.      BD is now using this lawsuit as a springboard to harass and make false statements to Cytek's potential customers about Cytek and its products.  BD is touting the purported strength of its case against Cytek and falsely telling potential Cytek customers that Cytek's Aurora platform is built on technology "stolen" from BD.  BD's strategy is a familiar one—file meritless litigation and then promote it to Cytek's customer base with false statements of fact to dissuade the purchase of Cytek products and to promote BD's own products—apparently in an attempt to, among other things, acquire Cytek for a very low price.

6.      BD's unlawful and unfair business practices, which have already materially impacted Cytek's sales of the Aurora flow cytometer, must stop.  Cytek brings these counterclaims against BD for violation of California's Unfair Competition Law and declaratory relief.  Cytek requests that this Court enjoin BD from engaging in continued unfair competition and declare that the holdover provisions in BD's employee agreements are invalid and void under California law.

**PARTIES**

7.      Cytek is a Delaware corporation with its principal place of business at 46107 Landing Parkway, Fremont, California 94538.

8.      BD is a New Jersey corporation with its principal place of business at 1 Becton Drive, Franklin Lakes, New Jersey 07417.

---

[1] The "Individual Defendants" are Ming Yan, Alfred "Ken" Riley, David Vrane, Zhenyu Zhang, Zhenxiang Gong, Alex Zhong, Maria Jaimes, Gil Reinin, and Janelle Shook.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.     This Court has personal jurisdiction over BD, who has consented to this Court's jurisdiction by filing a complaint against Cytek arising out of the same transaction or occurrence as Cytek's counterclaims.  In addition, BD maintains regular and significant contacts with the State of California, including by conducting substantial business, employing a substantial number of employees, and maintaining permanent business establishments therein.

11.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Cytek's counterclaims occurred in this district, and because BD maintains sufficient contacts with this district such that it would be subject to personal jurisdiction if this district were a separate state.

**BACKGROUND**

**A.     Cytek's Emerges on the Scene with the DxP Athena™ and Aurora Cytometers**

12.     Cytek is a developer and supplier of innovative flow cytometry products, and an emerging competitive threat to BD, which has long been a dominant player in the flow cytometry space.  Cytek is the result of a 2015 merger between Cytek Development, Inc. ("Cytek Development") and Cytoville, Inc. ("Cytoville").  Cytoville was a company focused on advanced bio-life-science instrument development.  Cytek Development was a company that had, for decades, serviced flow cytometers sold by BD and other companies, and that developed and sold upgrades for flow cytometers sold by BD and other companies.  Through that work, Cytek Development gained an in-depth knowledge of flow cytometry technologies and gained substantial experience designing and manufacturing every key component of a flow cytometry system.

13.     In or around October 2016, a little over a year after the merger that formed Cytek, Cytek introduced its first flow cytometer, the DxP Athena™ ("Athena"), under its brand as a new company.  The Athena featured established flow cytometry technology that Cytek's Chief Scientist, Eric Chase, Ph.D., had developed at Cytek Development well before Cytek hired the Individual

1   Defendants, who joined Cytek in 2015 and 2016.[2]  Utilizing a mechanical chassis designed by Cytek

2   employees in China and software developed under an exclusive contract by FlowJo, LLC (a company

3   later acquired by BD), the Athena was a re-packaged platform that Cytek Development had

4   commercialized for many years and used in many laboratories in the United States before its merger

5   with Cytoville.

6         14.    Eight months later, in June 2017, Cytek shook the industry with its release of the

7   Cytek™ Aurora cytometer, a technological prodigy built on a unique combination of patent-pending

8   innovations, including from the telecommunications industry.  The Aurora is a departure from the

9   traditional cytometer designs that BD and others have employed for decades.  Cytek developed the

10  Aurora without the use of any BD confidential information or trade secrets.

11        15.    Like Cytek's other competitors, BD was well aware of the Athena and Aurora upon

12  their release in 2016 and 2017, respectively.

13        16.    The successful launch of Cytek's business should have come as no surprise.  Cytek's

14  development team has decades of experience in the relevant field.  Dr. Chase founded Cytek

15  Development and served as its CEO for 25 years.  He holds multiple patents in the field ███████

16  █████████████████████████████████████████████   WenBin Jiang, Ph.D. is Cytek's co-

17  founder and its current Chief Executive Officer.  Dr. Jiang is a seasoned entrepreneur and inventor.

18  Dr. Jiang is an inventor on more than 90 U.S. patents and has authored four book chapters and more

19  than 50 peer-reviewed technical papers.  Cytek's other co-founder and its current Chief Technology

20  Officer is Ming Yan, Ph.D.  Dr. Yan holds a Ph.D. in biophysics and has worked in biodetection and

21  photonics for more than 20 years at respected institutions including AT&T Bell Laboratories and the

22  Lawrence Livermore National Laboratory.

23        **B.    BD Takes Defensive Action to Stifle Competition in the Flow Cytometry Space**

24        17.    Not surprisingly, Cytek's emergence as a developer and manufacturer of innovative

25  cytometry products generated significant interest not only among potential users, but also among

26

27  ───────────────
    [2] Considering the geographic proximity between BD's cytometer division (San Jose) and Cytek

28  (Fremont), BD's sheer size as a company, and BD's dominance of the global market for flow
    cytometers, it should come as no surprise that some of Cytek's hires naturally come from BD's ranks.

Cytek's now-competitors, including BD.  BD, which commands 50–60% of the global market for flow cytometers, took quick action to try to quash this budding competition.

18.    Just months after the Aurora's release, Cytek learned that BD had already started pressuring potential Cytek customers.  As relayed by a customer of Cytek, for which Cytek and its predecessor had serviced and provided upgrades to existing BD cytometers for years, a BD executive threatened that BD would no longer supply the customer with the critical reagents for its BD cytometers if the institution purchased an Aurora from Cytek.

19.    On information and belief, other potential customers have been subject to similar threats.  A major U.S. cancer treatment center that was in discussions for the purchase of a Cytek Aurora reported to Cytek sales personnel that BD was holding hostage a reagent that is available only from BD.  Despite positive feedback on the Aurora, that center has still not purchased a Cytek flow cytometer.  Another cancer research center in the U.S. has also reported to Cytek sales personnel that, despite interest, it could not engage in the evaluation or purchase of a Cytek Aurora flow cytometer because it feared losing access to necessary BD reagents.  These two customers alone represent a potential loss of more than $300,000 in Aurora sales.

20.    BD's threats were significant.  Reagents are essential consumable substances used in flow cytometers to identify and analyze certain cellular characteristics.  Particular reagents are designed to be excited by lasers of different wavelengths.  When excited by the intended laser, the reagents fluoresce, which fluorescence is detected by the detection system in the flow cytometer.  The fluorescence provides information regarding the cell at issue.  Although vital to the operation of flow cytometers, reagents are marketed and sold separate and apart from the cytometry machines themselves, as evidenced by BD's own website, which includes distinct pages and information for cytometry "instruments" and cytometry "reagents."[3]

21.    BD markets a number of different reagents, each designed to be excited by a different laser in a flow cytometer.  BD's highest-end flow cytometer, the FACSymphony, includes five lasers: red, green-yellow, blue, violet, and ultraviolet ("UV").  As each reagent provides information

---

[3] *See* http://www.bdbiosciences.com/us/s/flowcytometry (last visited Mar. 6, 2019).

1  regarding different characteristics of a cell, use of multiple lasers allows for analysis of multiple

2  parameters in a single test.  In order to conduct analysis of multiple parameters, a customer develops

3  a "panel" of reagents designed specifically to identify various cell characteristics while limiting the

4  amount of overlap between the emissions of the different reagents.  Panel design must take into

5  account the performance of the particular flow cytometer being used.  Developing an appropriate panel

6  for research or diagnostic purposes is a lengthy and expensive process that can take several months or

7  more than a year to complete and requires substantial testing and validation of the design.  The

8  unavailability of any reagent incorporated into a panel requires a redesign of the entire panel.

9       22.    On information and belief, the reagents that BD threatened to withhold included

10  reagents designed to interact specifically with UV light for which there is no market alternative.  On

11  information and belief, the cost to develop UV reagents is substantial.  BD purports to be the exclusive

12  licensee to patents covering these UV reagents and other non-UV reagents, and on information and

13  belief, BD owns 100% market share of UV reagents globally.  BD's market power for these UV

14  reagents is further evidenced by the fact that it sells the UV reagents at a cost that is approximately

15  three times the cost of non-UV reagents for which market alternatives exist.  Moreover, when a

16  competitor developed and marketed what BD referred to as "copycat" non-UV products, BD filed suit

17  for patent infringement.[4]  As part of this lawsuit, BD also alleged that the competitor's internal use of

18  UV reagents for development purposes infringed BD's licensed patents.  Another reagent seller has

19  disclosed to Cytek that the substantial threat of patent litigation posed by BD has prevented it from

20  bringing a competing UV reagent to market.

21       23.    The potential loss of access to these BD reagents is substantial for Cytek's potential

22  customers.  The UV laser in BD's high-end flow cytometers, for example, represents a major

23  investment by BD's customers. On information and belief, the UV laser alone represents a substantial

24  portion of the BD flow cytometer.  On information and belief, BD sells its flow cytometers with UV

25  lasers at a price that is as much as double the price of flow cytometers without such laser—charging

26  $800,000 or more per machine.  BD launched its highest-end UV cytometer, the FACSymphony, in

27

28  _____
[4] *See* Case No. 17-cv-1395-H-NLS, Southern District of California.

or around 2016, and upon information and belief, has sold hundreds of these machines to customers to date.

24.     Given the substantial investment required, once a customer purchases a flow cytometer with UV laser functionality, such customer is locked in to purchasing the BD UV reagents.  If the customer loses access to the BD UV reagents as a result of a new BD policy to withhold reagents to Aurora customers, it has no alternative reagent and cannot take advantage of the UV laser for which it paid a substantial price.  The loss of the UV reagents also prevents a customer that has incorporated them into a particular panel design from using the panel to diagnose critical diseases like cancer or other infectious diseases until it redesigns the panel.  Thus, BD's threats to withhold reagents for which there is no market alternative gives BD substantial leverage over its customers.  Such leverage allows BD to coerce customers into refusing to purchase flow cytometers offered by Cytek and to dissuade customers from cooperating with Cytek's effort to discover additional instances of threats by BD.

25. 

26.

**D.** ████████████████████ **BD Attempts to Depress Cytek's Value with Spurious Allegations of Trade Secret Misappropriation and Litigation**



29.

On January 22, BD delivered a hostile letter titled "Misappropriation of Becton, Dickinson and Company Trade Secrets" from its outside counsel at Epstein Becker Green.  The letter claimed that BD "recently learned" that Dr. Yan, who had worked for BD prior to joining Cytek in early 2015, had improperly downloaded files containing BD confidential and proprietary information in the "days leading up to his departure from BD" three years earlier.  The letter's suggestion of trade secret misappropriation came as a shock to Cytek and its leadership, who approach the issue of third-party confidential information very seriously, and require that its employees not use such information at Cytek.

30.     BD offered no explanation as to why these allegations against Dr. Yan came to light only now—even though BD had known since at least 2015 that Dr. Yan worked for Cytek ██████ ██████████████████████████████   Instead, BD claimed that is was "continuing to investigate this matter," demanded Cytek's "cooperation"—including a "third party review" of Cytek's computer systems—and requested that Cytek preserve all documents and correspondence relating to "*any* Cytek employee, or former employee, who had a prior employment or consultant relationship with BD."

31.     Cytek investigated the allegations relating to Dr. Yan and, within three days, determined them to be entirely without merit.  Dr. Yan's supervisor at BD, who had since left BD to join another company, confirmed that she had instructed Dr. Yan to copy the files complained of by BD and leave them behind at BD so that BD would continue to have access to his work product, which Dr. Yan did.  Cytek's outside counsel communicated these facts to BD's counsel, who acknowledged

that such copying was a practice at BD, and confirmed that it had located the disk drive at issue at BD's facilities.  This should have put an end to the matter.

32.    Instead, BD's counsel then claimed that it had other concerns regarding Dr. Yan and the Individual Defendants, some of whom had been gone from BD for almost two years and the last of whom left BD fifteen months before BD raised any concerns.  BD contended that the Individual Defendants improperly downloaded other files during their employment at BD—not just immediately prior to their departures.  But, as Cytek confirmed, employees' use of removable storage drives in the ordinary course of their work was a common and, in fact, necessary occurrence at BD.

33.    After receiving additional, argumentative letters regarding the Individual Defendants— which demanded a response within one business day—counsel for Cytek sought additional information from BD so that it could adequately investigate BD's claims.  BD provided one piece of information, but ignored Cytek's other requests.  Then, instead of working with Cytek, whose "cooperation" BD requested and had been receiving, BD filed this lawsuit on February 13, 2018, claiming that it "had no viable alternative."

34.    In addition to its public allegations of trade secret misappropriation, BD claimed that Cytek induced the Individual Defendants to breach provisions in their BD employee agreements that, in BD's words, required the Individual Defendants to assign "to BD all right, title, and interest in any innovations developed during . . . a period of one year after their employment."  BD contends that Cytek and the Individual Defendants filed patents relating to flow cytometry that fall within the scope of this inordinately broad assignment provision, also known as a "holdover" clause.  BD's allegations based on this provision have been dismissed twice now.  Nevertheless, BD has made clear that it intends to conduct discovery and pursue claims on this theory against Cytek and the Individual Defendants in the future, including by requesting production by Cytek under Federal Rule of Civil Procedure 34 of "[a]ll documents concerning patents, patent applications, or invention disclosure statements relating to Flow Cytometry Systems or Spectral Flow Cytometry Systems that were drafted, submitted, or filed by [Cytek or on Cytek's behalf] . . ." from January 1, 2012 to the present.

35.    Almost immediately, BD's filing of suit had its intended effect.  In March 2018, the organizer of an important European conference on clinical cell analysis—a valuable opportunity for

Cytek to showcase its flow cytometry technology to the substantial European market—rescinded Cytek's invitation to present at the conference, explaining that it "ha[d] become aware" of BD's allegations of trade secret misappropriation. And, more recently, Cytek learned that researchers at a large, public university purchased a competitor's cytometer instead of the Aurora because of the pendency of BD's claims against Cytek in this action.

**E.      BD Takes its Campaign Directly to Cytek's Customers and Prospective Customers**

36.     Not inclined to resolve its issues in the courts, BD is now trying to use its allegations of trade secret misappropriation to influence Cytek's customers and potential customers outside of the courtroom. Over the last several months, Cytek has learned of repeated instances of BD and its sales representatives making false statements of fact about Cytek's products and practices, to draw business away from Cytek.

37.     By way of example, Cytek learned earlier this year from a representative of one of the premier cancer centers in the world that BD has been applying substantial pressure to the institution, which had been impressed with the Cytek Aurora machine. BD apparently stated that purchasing the Aurora would be very risky because BD has such a strong case against Cytek. Cytek also learned recently that BD falsely told a representative of a large, public research university and potential Cytek customer that Cytek "stole" the technology in the Aurora flow cytometer from BD.

38.     BD also appears to be utilizing an influential member of the United States government to do its bidding as well. For example, in the summer of 2018, Cytek was informed by a researcher at a Cytek customer that a government official who has a long-standing relationship with BD had falsely stated that the Aurora reflected technology "stolen" by Cytek. He then disclosed what may be BD's ultimate goal—telling the researcher that BD would get the Aurora technology back for a very low price. His latter observation, which he could only know by being in a special, confidential relationship with BD, confirmed what Cytek suspected all along.

39.     BD's ability to spread false information about Cytek quickly and widely is not surprising. BD is an entrenched powerhouse in the flow cytometry market. Indeed, virtually all of Cytek's customers and potential customers are also customers of BD. Thus, if a participant in the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10.

CYTEK'S FIRST AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

space is interested in purchasing a Cytek cytometer, BD likely knows.

40.     To date, Cytek has heard of BD's improper conduct only because Cytek has existing service relationships with many (70% or more) of its potential customers for the Athena and Aurora cytometers. In other cases, Cytek benefits from the honesty of researchers with whom it has no prior relationship. Unfortunately, as noted above, BD's exclusive market position in UV reagents also dissuades customers from cooperating with Cytek's effort to discover additional instances of threats by BD. Cytek justifiably believes that the instances of BD threats and improper influence reflected above represent only the tip of the iceberg and that discovery in this case will demonstrate a far-reaching policy of tying essential reagents to customers' refusal to purchase Cytek's Aurora cytometer.

**F.     BD's Efforts Have Harmed Cytek and Competition**

41.     BD's efforts to spread misinformation about Cytek and improperly pressure potential customers from purchasing Cytek machines are materially affecting Cytek's business. Since BD has started with its false statements and threats to potential customers, the rate at which Cytek converts a demonstration of its Aurora product to a sale dropped by approximately 40% and has only slightly recovered. On information and belief, Cytek's drop in sales from 2017 to 2018 resulted directly from BD's efforts to stifle demand for Cytek products, including by coercing potential customers to not purchase Cytek's Aurora.

42.     Cytek's Athena and Aurora platforms, which are customizable by the purchaser, range in price from tens of thousands of dollars for the Athena to more than $250,000 for an Aurora (depending on the precise configuration). Thus, although Cytek's full damages are as yet unknown, the impact of BD's unlawful and unfair business practices on Cytek's sales alone is estimated to be in the millions. Unless BD's illegal conduct is stopped by this Court, this impact will only worsen.

43.     Cytek is confident that discovery in this action will yield additional evidence of wrongdoing on BD's part, and therefore reserves the right to assert additional counterclaims against BD, including for tortious interference. For now, Cytek asserts the following counterclaims against BD.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11.

CYTEK'S FIRST AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

FIRST CAUSE OF ACTION

UNFAIR COMPETITION LAW — CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ.

44.     Cytek repeats and realleges each and every allegation in the foregoing paragraphs 1 through 43 as though fully set forth herein.

45.     California's Unfair Competition Law, Business & Professions Code § 17200 *et seq.*, gives courts the power the enjoin companies such as BD who engage in any unlawful, unfair, or fraudulent business acts or practices.

46.     BD is engaging in unlawful and unfair business practices.  By way of example, BD has threatened potential Cytek customers that if they purchase a Cytek Aurora platform, BD will refuse to supply those potential customers with reagents essential to the operation of existing cytometers already purchased by those same customers.

47.     These reagents are distinct products that are sold separate and apart from the cytometers that use them.  The reagents at issue include proprietary UV reagents for which there is no market alternative.  BD has 100% of the global market for these UV reagents.  BD's dominant position in the market for cytometer UV reagents is sufficient to coerce potential Cytek customers from purchasing Cytek products, because BD's refusal to supply these reagents renders the potential customers' existing cytometers substantially impaired, and would require these customers to undertake an expensive and time-consuming re-design of existing cytometer panels, as alleged above.

48.     On information and belief, BD's tying of the sale of its UV (and other) reagents to its customers' refusal to purchase competing Cytek machines has had a substantial impact on, and will continue to have a substantial impact on, Cytek's sales of Aurora cytometers and the flow cytometer market overall, in an amount as yet unknown, but estimated to be in the millions, as noted above.  At least one customer has informed Cytek sales personnel that it has not proceeded with an evaluation or purchase of the Cytek Aurora for fear of losing access to BD reagents.  BD's tying conduct threatens to lessen competition for flow cytometers in California and the United States generally.  Cytek's Aurora represents a viable alternative to the far more expensive flow cytometers offered by BD.  As a result of its innovative technology, the Aurora provides superior or equal performance to the BD FACSymphony for half the cost.  By threatening customers' access to necessary BD UV (and other)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12.

CYTEK'S FIRST AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

reagents, BD can eliminate from competition the most cost effective flow cytometer available.

49.     BD's tying conduct is prohibited by and threatens an incipient violation of at least Section 3 of the Clayton Act, 15 U.S.C. § 14, and California's Cartwright Act, Business & Professions Code §§ 16720 and 16727.  BD's tying conduct violates the policy and spirit of these laws because its actual and/or threatened effects are the same as a violation of those laws.  And BD's tying conduct significant threatens or harms competition.

50.     Finally, BD has engaged in unlawful and unfair business practices by requiring its employees—including certain Individual Defendants—to enter into employee agreements that are illegal under California Business & Professions Code § 16600.

51.     BD's employee agreements include an assignment, or "holdover," provision that requires former employees to assign all "right, title, and interest in any Innovation *relating to* Confidential Information arising because of [their] employment with [BD], conceived or made by [them] . . . at any time for a period of one (1) year after employment . . . ."  An "Innovation" is defined under the BD employee agreements as "any idea, invention, discovery, improvement, copyright, and the like."  "Confidential Information" is broadly defined to include

> any proprietary, business or technical information of the Company [*i.e.*, BD], including
> *but not limited to* any confidential or unpublished information, business plan, financial
> information, trade secret, computer program, design, product, process, procedure,
> formula, research, improvement, work of authorship, or the like, whether of a technical
> or non-technical nature, relating to the business of the Company or to my activities as
> an employee of the Company which was obtained or acquired by me [*i.e.*, each
> Individual Defendant] during the term of my employment with the Company . . . .

52.     These holdover provisions violate California Business & Professions Code § 16600, which provides, with certain exceptions not applicable here, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

53.     BD has asserted claims in this action against Cytek for inducing breach of these illegal holdover clauses.  To date, BD's inducement claims against Cytek have been dismissed; however, BD continues to seek discovery relevant to its holdover claims.  Moreover, BD has not conceded that its holdover clause is void under California law and has preserved the right to enforce a void provision

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13.

CYTEK'S FIRST AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

as to the Individual Defendants and all other employees in California in the future. Finally, Cytek has already suffered economic injury because it has expended substantial attorneys' fees defending itself against BD's claims based on the illegal holdover provisions.

54.     Cytek has standing to bring a claim under the Unfair Competition Law under Business & Professions Code § 17204 because it has suffered the aforementioned injury in fact and, on information and belief, has lost money or property as a result of BD's unlawful and unfair business acts and practices in an amount as yet unknown.

55.     As a result of BD's unlawful and unfair business practices, Cytek has also suffered, and will continue to suffer, irreparable harm to its business reputation, good will, and stature in the business community and with its customers and potential customers, for which there is no adequate remedy at law. On information and belief, BD has not withdrawn the threats to withhold BD reagents that it made to potential purchasers of Cytek flow cytometers.

56.     Absent injunctive relief against BD's unlawful and unfair acts, Cytek will continue to be irreparably harmed and BD will continue to be unjustly enriched.

## SECOND CAUSE OF ACTION

### DECLARATORY RELIEF — 28 U.S.C. § 2201

57.     Cytek repeats and realleges each and every allegation in the foregoing paragraphs 1 through 56 as though fully set forth herein.

58.     Cytek and BD are parties to an actual controversy regarding the rights and other legal relations of certain Individual Defendants under employee agreements purportedly entered into with their former employer, BD.

59.     BD's employee agreements with the Individual Defendants include an assignment, or "holdover," provision that requires former employees to assign all "right, title, and interest in any Innovation *relating to* Confidential Information arising because of [their] employment with [BD], conceived or made by [them] . . . at any time for a period of one (1) year after employment . . . ." An "Innovation" is defined under the BD employee agreements as "any idea, invention, discovery, improvement, copyright, and the like." "Confidential Information" is broadly defined to include

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14.

CYTEK'S FIRST AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

any proprietary, business or technical information of the Company [*i.e.*, BD], including **but not limited to** any confidential or unpublished information, business plan, financial information, trade secret, computer program, design, product, process, procedure, formula, research, improvement, work of authorship, or the like, whether of a technical or non-technical nature, relating to the business of the Company or to my activities as an employee of the Company which was obtained or acquired by me [*i.e.*, each Individual Defendant] during the term of my employment with the Company . . . .

60.     Cytek, who employs the Individual Defendants and whose own employee agreements require the assignment of certain innovations developed by Individual Defendants during their employ by Cytek, contends that BD's holdover provisions are illegal and unenforceable under California Business & Professions Code § 16600, which provides, with certain exceptions not applicable here, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

61.     BD does not dispute that California Business & Professions Code § 16600 applies to its employee agreements with the Individual Defendants, but contends that its holdover provision is valid and enforceable thereunder.

62.     BD's threat of enforcing the employee agreements' holdover provisions—including through claims in this litigation—has created substantial uncertainty over the ownership of innovations developed by certain Individual Defendants in Cytek's employ.

63.     Therefore, Cytek seeks a declaration from this Court that the holdover provisions in BD's employee agreements with the Individual Defendants are void and unenforceable.

### PRAYER FOR RELIEF

Wherefore, Cytek prays that this Court enter a judgment against BD as follows:

1.     A permanent injunction against BD enjoining it and its representatives from engaging in the unlawful and unfair business practices described herein;

2.     A declaration that the holdover provisions in BD's employee agreements are void and unenforceable.

### JURY DEMAND

Cytek hereby demands a jury trial on all issues and claims so triable.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

CYTEK'S FIRST AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

1

Dated:        March 7, 2019                    COOLEY LLP
                                               STEVEN C. NEAL (170085)

2                                              MARTIN S. SCHENKER (109828)
                                               JEFFREY S. KARR (186372)

3                                              DANE R. VORIS (281051)

4

5                                              /s/ *Jeffrey S. Karr*
                                               _____

6                                              Jeffrey S. Karr (186372)
                                               Attorneys for Defendant and Counterclaimant

7                                              Cytek Biosciences Inc.

8
         527933

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28