1  COOLEY LLP
   STEPHEN C. NEAL (170085) (sneal@cooley.com)
2  JEFFREY S. KARR (186372) (jkarr@cooley.com)
   DANE R. VORIS (281051) (dvoris@cooley.com)
3  3175 Hanover Street
   Palo Alto, CA  94304-1130
4  Telephone:   (650) 843-5000
   Facsimile:   (650) 849-7400
5
   MARTIN S. SCHENKER (109828) (mschenker@cooley.com)
6  101 California Street, 5th Floor
   San Francisco, CA 94111-5800
7  Telephone:   (415) 693-2000
   Facsimile:   (415) 693-2222
8
   Attorneys for Defendant and Counterclaimant
9  Cytek Biosciences Inc.

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| BECTON, DICKINSON AND COMPANY, | Case No.  3:18-cv-00933 MMC |
| Plaintiff and Counterclaim-Defendant, | **CYTEK BIOSCIENCES INC.'S SECOND AMENDED COUNTERCLAIMS AGAINST BECTON, DICKINSON AND COMPANY** |
| v. | |
| CYTEK BIOSCIENCES INC., MING YAN, ALFRED RILEY, DAVID VRANE, ZHENYU ZHANG, ZHENXIANG GONG, ALEX ZHONG, MARIA JAIMES, GIL REINEN, AND JANELLE SHOOK, | **DEMAND FOR JURY TRIAL** |
| Defendants and Counterclaimants. | |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**SECOND AMENDED COUNTERCLAIMS**

Cytek Biosciences Inc. ("Cytek"), by and through its undersigned counsel, alleges the following counterclaims against Becton, Dickinson and Company ("BD") on information and belief:

**PRELIMINARY STATEMENT**

1.       This case is about an established market leader's improper interference with an upstart competitor's business in the markets for flow cytometry instruments and the servicing, repair, and upgrading (collectively, "servicing" or "service") of those instruments.  Flow cytometry is a powerful, laser-based technology used for identifying and quantifying cellular characteristics on a cell-by-cell basis that offers a variety of biomedical and therapeutic applications, including investigation of the immune system's role in combating cancer, and the diagnosis of leukemia and lymphoma.  For years, BD has held a dominant market share in the flow cytometry instrument market and in the market for servicing BD cytometry instruments.

2.       Cytek is a developer and supplier of innovative flow cytometry products and services, and an emerging competitive threat to BD.  Headquartered in Fremont, Cytek serves more than 500 customer-clients, including top tier research institutions, government agencies, medical schools, and private and public companies.

3.       For decades, Cytek and its predecessor, Cytek Development, Inc. ("Cytek Development"), have engaged in the business of servicing BD flow cytometry instruments.  Cytek's only significant competition in the market for servicing BD machines is BD itself, who commands up to, if not more than, 70% of this market.  Nevertheless, for decades BD has voluntarily supplied Cytek with the essential BD parts necessary for Cytek to service existing BD cytometry instruments.

4.       Recently, however, Cytek released two of its own flow cytometry platforms to the market—the first employing existing technology that Cytek leadership developed over decades of experience in the field, and the second based on an advanced technology called spectral flow cytometry, which Cytek combined for the first time ever with innovations from the telecommunications industry.  BD admittedly has no similar spectral flow cytometry offering.

5.       After Cytek introduced its spectral flow instrument, marketed under the product name Aurora, BD focused its attention on a multi-front strategy to eliminate Cytek and the competitive threat

1   it represents.  First, in an effort to extend its monopoly position in the BD service market and choke

2   off Cytek's reliable, service-related cash flow, BD began refusing to fulfill Cytek's purchase orders of

3   the BD replacement parts necessary to service existing BD cytometry instruments.  BD's effort has

4   had its intended effect: In April 2019, Cytek was forced to conclude that, due to the increasing

5   difficulty of obtaining critical parts from BD, it could no longer offer service contracts for BD

6   cytometry instruments after December 2019.  BD's refusal to supply Cytek with these essential

7   replacement parts is a violation of federal law.

8        6.   ███████████████████████████████████

9   ████████████████████████   BD pursued a different strategy—interfering with Cytek's

10  sales process.  BD has warned potential Cytek customers that, should they purchase an Aurora

11  machine, BD would refuse to supply them with the essential reagents necessary to operate the

12  customers' existing machines—a threat that, if carried out, would render these expensive machines

13  substantially impaired.  Thus, BD *tied* the sale of cytometer reagents to its customers' refusal to

14  purchase a competing machine from Cytek.  Anti-competitive tying arrangements such as this are

15  prohibited by federal and California law.

16       7.   BD then filed this lawsuit against Cytek and nine former BD employees (the

17  "Individual Defendants")[1] complaining of alleged trade secret misappropriation, employee

18  "poaching," and violation of restrictive employee covenants.  Among other things, BD claimed that

19  its former employees—who left BD for their own reasons and joined Cytek over a period of nearly

20  two years—breached assignment, or "holdover," provisions in their BD employee agreements when

21  they failed to turn over innovations developed *after* leaving BD.  These restrictive employment

22  provisions, which harm both former employees and future employers like Cytek, are illegal under

23  California law, and cannot be enforced by BD.

24       8.   BD is now using this lawsuit as a springboard to harass and make false statements to

25  Cytek's potential customers about Cytek and its products.  BD is touting the purported strength of its

26  case against Cytek and falsely telling potential Cytek customers that Cytek's Aurora platform is built

---

[1] The "Individual Defendants" are Ming Yan, Alfred "Ken" Riley, David Vrane, Zhenyu Zhang, Zhenxiang Gong, Alex Zhong, Maria Jaimes, Gil Reinin, and Janelle Shook.

1   on technology "stolen" from BD.  BD's strategy is a familiar one—file meritless litigation and then

2   promote it to Cytek's customer base with false statements of fact to dissuade the purchase of Cytek

3   products and to promote BD's own products—apparently in an attempt to, among other things, acquire

4   Cytek for a very low price.

5          9.      BD's anti-competitive business practices, which have already impacted and are

6   threatening continuing material impact to Cytek's service operations and sales of the Aurora flow

7   cytometer, must stop.  Cytek brings these counterclaims against BD for violation of the Sherman

8   Antitrust Act and California's Unfair Competition Law, and for declaratory relief.  Cytek requests that

9   this Court enjoin BD from engaging in continued unlawful and unfair competition, declare that the

10  holdover provisions in BD's employee agreements are invalid and void under California law, and

11  award Cytek treble damages and other appropriate relief for the substantial service-related income it

12  has lost and will continue to lose because of BD's monopolistic conduct.

13                                        **PARTIES**

14         10.     Cytek is a Delaware corporation with its principal place of business at 46107 Landing

15  Parkway, Fremont, California 94538.

16         11.     BD is a New Jersey corporation with its principal place of business at 1 Becton Drive,

17  Franklin Lakes, New Jersey 07417.

18                              **JURISDICTION AND VENUE**

19         12.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28

20  U.S.C. § 1331 because Cytek's counterclaims arise, at least in part, "under the Constitution, laws, or

21  treaties of the United States."  This Court also has subject matter jurisdiction over these counterclaims

22  pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in

23  controversy exceeds $75,000, exclusive of interests and costs.

24         13.     This Court has personal jurisdiction over BD, who has consented to this Court's

25  jurisdiction by filing a complaint against Cytek arising out of the same transaction or occurrence as

26  Cytek's counterclaims.  In addition, BD maintains regular and significant contacts with the State of

27  California, including by conducting substantial business, employing a substantial number of

28  employees, and maintaining permanent business establishments therein.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Cytek's counterclaims occurred in this district, and because BD maintains sufficient contacts with this district such that it would be subject to personal jurisdiction if this district were a separate state.  Venue is also proper in this district under 15 U.S.C. § 22 because BD inhabits, may be found in, and transacts business in this district.

**BACKGROUND**

**A.     Cytek Services and Upgrades BD Cytometry Instruments for Decades**

15.     Cytek is the result of a 2015 merger between Cytek Development and Cytoville, Inc. ("Cytoville").   Cytoville was a company focused on advanced bio-life-science instrument development.  Cytek Development was a company that had, for decades, serviced flow cytometry instruments sold by BD, and that developed and sold upgrades for cytometry instruments sold by BD. Following the merger, Cytek continued Cytek Development's BD service operations, which generated approximately $4-6 million in annual revenue from maintenance and repair work, and approximately $3-4 million in annual revenue from upgrades.

16.     The principal competitors in the global market for servicing BD cytometry instruments (the "BD Service Market")—which includes flow cytometers and cell sorters—are Cytek and BD itself.  Cytek services a host of BD instruments, including the FACSCanto, FACSAria, FACSScan, FACSCalibur, and LSRII platforms.

17.     Cytek and BD enter into contracts with existing BD instrument customers to provide services for BD instruments, typically following the standard warranty period offered by BD for its machines.[2]  Customers who purchase BD machines are not obligated—contractually or otherwise—to service those machines through BD.  Instead, those customers understand that they may enter into agreements with BD, Cytek, or other third-parties to service their BD instruments.  Other companies, such as Thermo-Fisher and Remi, also offer service contracts for BD instruments; however, the actual services performed under those third-party contracts are outsourced to BD or Cytek.  Upon information

---

[2] The maintenance *and* repair nature of these service contracts is critical.  While periodic maintenance is an important service, customers are not willing to enter into a contract with Cytek unless it can also repair BD cytometers when necessary.

and belief, BD generates approximately $20-40 million in annual service-related revenue for its cytometry instruments, and commands up to, if not more than, 70% of the BD Service Market. Upon information and belief, GE Healthcare also provides service contracts for BD cytometry instruments, but its share of the BD Service Market is even less than Cytek's.

18. Cytek has managed secure a portion of the BD Service Market by offering higher quality services than BD at a lower price. Historically, Cytek has provided its customers BD service contracts at rates approximately 10-25% lower than BD's rates. That cost differential has narrowed in recent years, but still remains at a significant 5-15%. Cytek also offers better customer service than BD. As expected from a company its size, BD's customer service is burdensome and time-consuming for the customer. Cytek, on the other hand, provides customers with direct contact information for the Cytek technician assigned to each service.

19. The BD Service Market is also protected by high barriers to entry. Servicing of BD instruments can only be done by experienced technicians who are familiar with the highly complex BD instruments and the procedures to service them. BD trains and certifies only BD employees to service BD instruments. Cytek has developed the skill and expertise to service BD instruments over decades of experience in doing so.

20. Notwithstanding its superior service and lower prices, Cytek competes in the BD Service Market *only* because BD has, for decades, voluntarily supplied Cytek with the BD parts essential to the repair and upgrading of BD flow cytometers. Many of these complex and essential parts are available only from BD and cannot be reverse engineered. By way of example only, if a customer needs a replacement printed circuit board ("PCB") as part of its service, Cytek must obtain both the PCB and the BD-specific firmware associated with that PCB from BD.

21. In some instances, BD itself obtains these essential parts from third-party manufacturers, but BD's agreements allow those manufacturers to supply BD only. Thus, even if Cytek approached BD's manufacturer to obtain parts, that manufacturer is prohibited from supplying them to Cytek.

22. Until recently Cytek has not experienced any major problems with obtaining replacement parts directly from BD.

**B.**     **Cytek Emerges on the Scene with the DxP Athena™ and Aurora Cytometers**

23.     Through its work servicing and upgrading cytometers for approximately 25 years, Cytek Development gained an in-depth knowledge of flow cytometry technologies and gained substantial experience designing and manufacturing every key component of a flow cytometry system.

24.     In or around October 2016, a little over a year after the merger that formed Cytek, Cytek introduced its first flow cytometer, the DxP Athena™ ("Athena"), under its brand as a new company.  The Athena featured established flow cytometry technology that Cytek's former Chief Scientist, Eric Chase, Ph.D., had developed at Cytek Development well before Cytek hired the Individual Defendants, who joined Cytek in 2015 and 2016.[3]  Utilizing a mechanical chassis designed by Cytek employees in China and software developed under an exclusive contract by FlowJo, LLC (a company later acquired by BD), the Athena was a re-packaged platform that Cytek Development had commercialized for many years and used in many laboratories in the United States before its merger with Cytoville.

25.     Eight months later, in June 2017, Cytek shook the industry with its release of the Cytek™ Aurora cytometer, a technological prodigy built on a unique combination of patent-pending innovations, including from the telecommunications industry.  The Aurora is a departure from the traditional cytometer designs that BD and others have employed for decades.  Cytek developed the Aurora without the use of any BD confidential information or trade secrets.

26.     Like Cytek's other competitors, BD was well aware of the Athena and Aurora upon their release in 2016 and 2017, respectively.

27.     The successful launch of Cytek's business should have come as no surprise.  Cytek's development team has decades of experience in the relevant field.  Dr. Chase founded Cytek Development and served as its CEO for 25 years.  He holds multiple patents in the field ███████ ███████████████████████████████████████████ WenBin Jiang, Ph.D. is Cytek's co-founder and its current Chief Executive Officer.  Dr. Jiang is a seasoned entrepreneur and inventor.

---

[3] Considering the geographic proximity between BD's cytometer division (San Jose) and Cytek (Fremont), BD's sheer size as a company, and BD's dominance of the global market for flow cytometers, it should come as no surprise that some of Cytek's hires naturally come from BD's ranks.

Dr. Jiang is an inventor on more than 90 U.S. patents and has authored four book chapters and more than 50 peer-reviewed technical papers.  Cytek's other co-founder and its current Chief Technology Officer is Ming Yan, Ph.D.  Dr. Yan holds a Ph.D. in biophysics and has worked in biodetection and photonics for more than 20 years at respected institutions including AT&T Bell Laboratories and the Lawrence Livermore National Laboratory.

**C.      BD Leverages its Monopoly Position to Curb Cytek's Service Operations**

28.     Not surprisingly, Cytek's emergence as a developer and manufacturer of innovative cytometry products generated significant interest not only among potential users, but also among Cytek's competitors, including BD.  BD, which commands 50-60% of the global market for flow cytometry instruments, took quick action to try to quash Cytek.

29.     Shortly after Cytek released the Aurora, BD began refusing to fulfill Cytek's purchase orders for BD parts essential to Cytek's servicing of BD flow cytometry instruments.  Cytek and its predecessor had purchased essential parts from BD for decades and had always been willing to pay BD's quoted price.  But starting in or around the fall of 2017, BD's procurement office repeatedly told Cytek that certain critical replacement parts were not available for sale, or were unavailable due to "internal [BD] issues."  Cytek confirmed that these explanations were a pretext by contacting a BD employee outside of BD's procurement office, who informed Cytek that BD in fact had plenty of the requested parts in its supply.  Today, BD tells Cytek that the requested BD replacement parts are for BD's own service contracts and service customers only.

30.     For example, Cytek does a substantial amount of service on BD's FACSAria instruments.  An essential component of the FACSAria is its flow cell—an optical component through which a fluid is drawn and interrogated by a laser.  The FACSAria's flow cell must be replaced at fairly regular intervals, and Cytek performs this replacement under its service contracts with BD instrument customers.  Replacement flow cells are available only through BD, which has voluntarily supplied these components to Cytek in the past.  Today, BD refuses to supply Cytek with the essential flow cells for its FACSAria instruments.

31.     PCBs are another essential component of BD cytometry instruments that must be replaced under Cytek's service contracts.  Without operational PCBs, the BD instrument cannot

process critical signals or analyze the data that the cytometer is designed to collect. In addition to the PCB hardware, BD's PCBs utilize BD-specific firmware that can only be obtained from BD. Unlike in the past, BD is now refusing to supply Cytek with essential replacement PCBs for BD instruments.

32.     The number of essential BD replacement parts that BD is refusing to supply to Cytek has only increased since BD filed this lawsuit in February 2018.

33.     Cytek has been able to sustain its BD service operations since the filing of this lawsuit largely by turning to the used instrument market. Cytek purchases used BD instruments in the open market and cannibalizes parts from these machines to re-use in customers' instruments. This strategy worked in the short term—albeit at a significantly increased cost to Cytek—but with a dwindling supply of used devices, it is becoming increasingly difficult for Cytek to fulfill its obligations under customers' service contracts.

34.     The risk that Cytek will not be able to perform its obligations under its BD service contracts has become so significant that Cytek has been forced to cease future service operations for BD instruments. In April 2019, Cytek was forced to conclude that it must cease offering new BD service contracts in January 2020 because replacement BD system components have become increasingly difficult to obtain from BD. Cytek understands that BD personnel celebrated Cytek's decision, which is not surprising, as Cytek's loss in the BD Service Market is BD's gain.

**D.     BD Takes Defensive Action to Stifle Competition in Flow Cytometer Market**

35.     Just months after the Aurora's release, Cytek also learned that BD had already started pressuring potential Cytek customers. As relayed by a customer of Cytek, for which Cytek and its predecessor had serviced and provided upgrades to existing BD cytometers for years, a BD executive threatened that BD would no longer supply the customer with the critical reagents for its BD cytometers if the institution purchased an Aurora from Cytek.

36.     On information and belief, other potential customers have been subject to similar threats. A major U.S. cancer treatment center that was in discussions for the purchase of a Cytek Aurora reported to Cytek sales personnel that BD was holding hostage a reagent that is available only from BD. Despite positive feedback on the Aurora, that center has still not purchased a Cytek flow cytometer. Another cancer research center in the U.S. has also reported to Cytek sales personnel that,

despite interest, it could not engage in the evaluation or purchase of a Cytek Aurora flow cytometer because it feared losing access to necessary BD reagents.  These two customers alone represent a potential loss of more than $300,000 in Aurora sales.

37.   BD's threats were significant.  Reagents are essential consumable substances used in flow cytometers to identify and analyze certain cellular characteristics.  Particular reagents are designed to be excited by lasers of different wavelengths.  When excited by the intended laser, the reagents fluoresce, which fluorescence is detected by the detection system in the flow cytometer.  The fluorescence provides information regarding the cell at issue.  Although vital to the operation of flow cytometers, reagents are marketed and sold separate and apart from the cytometry machines themselves, as evidenced by BD's own website, which includes distinct pages and information for cytometry "instruments" and cytometry "reagents."[4]

38.   BD markets a number of different reagents, each designed to be excited by a different laser in a flow cytometer.  BD's highest-end flow cytometer, the FACSymphony, includes five lasers: red, green-yellow, blue, violet, and ultraviolet ("UV").  As each reagent provides information regarding different characteristics of a cell, use of multiple lasers allows for analysis of multiple parameters in a single test.  In order to conduct analysis of multiple parameters, a customer develops a "panel" of reagents designed specifically to identify various cell characteristics while limiting the amount of overlap between the emissions of the different reagents.  Panel design must take into account the performance of the particular flow cytometer being used.  Developing an appropriate panel for research or diagnostic purposes is a lengthy and expensive process that can take several months or more than a year to complete and requires substantial testing and validation of the design.  The unavailability of any reagent incorporated into a panel requires a redesign of the entire panel.

39.   On information and belief, the reagents that BD threatened to withhold included reagents designed to interact specifically with UV light for which there is no market alternative.  On information and belief, the cost to develop UV reagents is substantial.  BD purports to be the exclusive licensee to patents covering these UV reagents and other non-UV reagents, and on information and

---

[4] *See* http://www.bdbiosciences.com/us/s/flowcytometry (last visited Aug. 6, 2019).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

belief, BD owns 100% market share of UV reagents globally.  BD's market power for these UV reagents is further evidenced by the fact that it sells the UV reagents at a cost that is approximately three times the cost of non-UV reagents for which market alternatives exist.  Moreover, when a competitor developed and marketed what BD referred to as "copycat" non-UV products, BD filed suit for patent infringement.[5]  As part of this lawsuit, BD also alleged that the competitor's internal use of UV reagents for development purposes infringed BD's licensed patents.  Another reagent seller has disclosed to Cytek that the substantial threat of patent litigation posed by BD has prevented it from bringing a competing UV reagent to market.

40.     The potential loss of access to these BD reagents is substantial for Cytek's potential customers.  The UV laser in BD's high-end flow cytometers, for example, represents a major investment by BD's customers. On information and belief, the UV laser alone represents a substantial portion of the BD flow cytometer.  On information and belief, BD sells its flow cytometers with UV lasers at a price that is as much as double the price of flow cytometers without such laser—charging $800,000 or more per machine.  BD launched its highest-end UV cytometer, the FACSymphony, in or around 2016, and upon information and belief, has sold hundreds of these machines to customers to date.

41.     Given the substantial investment required, once a customer purchases a flow cytometer with UV laser functionality, such customer is locked in to purchasing the BD UV reagents.  If the customer loses access to the BD UV reagents as a result of a new BD policy to withhold reagents to Aurora customers, it has no alternative reagent and cannot take advantage of the UV laser for which it paid a substantial price.  The loss of the UV reagents also prevents a customer that has incorporated them into a particular panel design from using the panel to diagnose critical diseases like cancer or other infectious diseases until it redesigns the panel.  Thus, BD's threats to withhold reagents for which there is no market alternative gives BD substantial leverage over its customers.  Such leverage allows BD to coerce customers into refusing to purchase flow cytometers offered by Cytek and to dissuade customers from cooperating with Cytek's effort to discover additional instances of threats by BD.

---

[5] *See* Case No. 17-cv-1395-H-NLS, Southern District of California.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO
11.
CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

1    **E.**

2    42.

3

4

5

6

7

8

9    43.

10

11

12

13

14

15   44.

16

17

18   **F.**                              **BD Attempts to Depress Cytek's Value with**
19   **Spurious Allegations of Trade Secret Misappropriation and Litigation**

20   45.

21

22

23   46.

24

25                                                                          On January 22, BD

26   delivered a hostile letter titled "Misappropriation of Becton, Dickinson and Company Trade Secrets"

27   from its outside counsel at Epstein Becker Green.  The letter claimed that BD "recently learned" that

28   Dr. Yan, who had worked for BD prior to joining Cytek in early 2015, had improperly downloaded

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

1   files containing BD confidential and proprietary information in the "days leading up to his departure

2   from BD" three years earlier.  The letter's suggestion of trade secret misappropriation came as a shock

3   to Cytek and its leadership, who approach the issue of third-party confidential information very

4   seriously, and require that its employees not use such information at Cytek.

5       47.   BD offered no explanation as to why these allegations against Dr. Yan came to light

6   only now—even though BD had known since at least 2015 that Dr. Yan worked for Cytek ███

7   ████████████████████████████.  Instead, BD claimed that is was "continuing

8   to investigate this matter," demanded Cytek's "cooperation"—including a "third party review" of

9   Cytek's computer systems—and requested that Cytek preserve all documents and correspondence

10  relating to "*any* Cytek employee, or former employee, who had a prior employment or consultant

11  relationship with BD."

12      48.   Cytek investigated the allegations relating to Dr. Yan and, within three days,

13  determined them to be entirely without merit.  Dr. Yan's supervisor at BD, who had since left BD to

14  join another company, confirmed that she had instructed Dr. Yan to copy the files complained of by

15  BD and leave them behind at BD so that BD would continue to have access to his work product, which

16  Dr. Yan did.  Cytek's outside counsel communicated these facts to BD's counsel, who acknowledged

17  that such copying was a practice at BD, and confirmed that it had located the disk drive at issue at

18  BD's facilities.  This should have put an end to the matter.

19      49.   Instead, BD's counsel then claimed that it had other concerns regarding Dr. Yan and

20  the Individual Defendants, some of whom had been gone from BD for almost two years and the last

21  of whom left BD fifteen months before BD raised any concerns.  BD contended that the Individual

22  Defendants improperly downloaded other files during their employment at BD—not just immediately

23  prior to their departures.  But, as Cytek confirmed, employees' use of removable storage drives in the

24  ordinary course of their work was a common and, in fact, necessary occurrence at BD.

25      50.   After receiving additional, argumentative letters regarding the Individual Defendants—

26  which demanded a response within one business day—counsel for Cytek sought additional

27  information from BD so that it could adequately investigate BD's claims.  BD provided one piece of

28  information, but ignored Cytek's other requests.  Then, instead of working with Cytek, whose

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

"cooperation" BD requested and had been receiving, BD filed this lawsuit on February 13, 2018, claiming that it "had no viable alternative."

51.     In addition to its public allegations of trade secret misappropriation, BD claimed that Cytek induced the Individual Defendants to breach provisions in their BD employee agreements that, in BD's words, required the Individual Defendants to assign "to BD all right, title, and interest in any innovations developed during . . . a period of one year after their employment."  BD contends that Cytek and the Individual Defendants filed patents relating to flow cytometry that fall within the scope of this inordinately broad assignment provision, also known as a "holdover" clause.  BD's allegations based on this provision have been dismissed twice now.  Nevertheless, BD has made clear that it intends to conduct discovery and pursue claims on this theory against Cytek and the Individual Defendants in the future, including by requesting production by Cytek under Federal Rule of Civil Procedure 34 of "[a]ll documents concerning patents, patent applications, or invention disclosure statements relating to Flow Cytometry Systems or Spectral Flow Cytometry Systems that were drafted, submitted, or filed by [Cytek or on Cytek's behalf] . . ." from January 1, 2012 to the present.

52.     Almost immediately, BD's filing of suit had its intended effect.  In March 2018, the organizer of an important European conference on clinical cell analysis—a valuable opportunity for Cytek to showcase its flow cytometry technology to the substantial European market—rescinded Cytek's invitation to present at the conference, explaining that it "ha[d] become aware" of BD's allegations of trade secret misappropriation.  And, more recently, Cytek learned that researchers at a large, public university purchased a competitor's cytometer instead of the Aurora because of the pendency of BD's claims against Cytek in this action.

**G.     BD Takes its Campaign Directly to Cytek's Customers and Prospective Customers**

53.     Not inclined to resolve its issues in the courts, BD is now trying to use its allegations of trade secret misappropriation to influence Cytek's customers and potential customers outside of the courtroom.  Cytek has learned of repeated instances of BD and its sales representatives making false statements of fact about Cytek's products and practices, to draw business away from Cytek.

54.     By way of example, Cytek learned from a representative of one of the premier cancer

Cooley LLP
Attorneys At Law
Palo Alto

14.

Cytek's Second Amended Counterclaims
Case No. 18-cv-00933MMC

centers in the world that BD has been applying substantial pressure to the institution, which had been impressed with the Cytek Aurora machine.  BD apparently stated that purchasing the Aurora would be very risky because BD has such a strong case against Cytek.  Cytek also learned that BD falsely told a representative of a large, public research university and potential Cytek customer that Cytek "stole" the technology in the Aurora flow cytometer from BD.

55.    BD also appears to be utilizing an influential member of the United States government to do its bidding as well.  For example, in the summer of 2018, Cytek was informed by a researcher at a Cytek customer that a government official who has a long-standing relationship with BD had falsely stated that the Aurora reflected technology "stolen" by Cytek.  He then disclosed what may be BD's ultimate goal—telling the researcher that BD would get the Aurora technology back for a very low price.  His latter observation, which he could only know by being in a special, confidential relationship with BD, confirmed what Cytek suspected all along.

56.    BD's ability to spread false information about Cytek quickly and widely is not surprising.  BD is an entrenched powerhouse in the flow cytometry market.  Indeed, virtually all of Cytek's customers and potential customers are also customers of BD.  Thus, if a participant in the space is interested in purchasing a Cytek cytometer, BD likely knows.

57.    To date, Cytek has heard of BD's improper threats and false statements only because Cytek has existing service relationships with many (70% or more) of its potential customers for the Athena and Aurora cytometers.  In other cases, Cytek benefits from the honesty of researchers with whom it has no prior relationship.  Unfortunately, as noted above, BD's market position in cytometry instruments and UV reagents also dissuades customers from cooperating with Cytek's effort to discover additional instances of threats and false statements by BD.  Cytek justifiably believes that the instances of BD threats and improper influence reflected above represent only the tip of the iceberg and that discovery in this case will demonstrate a far-reaching course of unlawful and anti-competitive conduct by BD.

## H.    BD's Efforts Have Harmed Cytek and Competition

58.    BD's refusal to provide Cytek with essential parts for BD cytometry instruments has had a significant adverse impact on Cytek.  Cytek's costs to repair BD instruments have increased

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

substantially over the last two years, as Cytek has had to resort to cannibalizing parts from used BD machines in order to fulfill its contractual obligations to service customers. More importantly, BD's new policy of refusing parts to Cytek has forced Cytek to cease offering service contracts to BD customers in January 2020 and to terminate its upgrade program for BD instruments. Cytek's annual $8-9 million revenues from these operations will be lost, and, unless BD is stopped by this Court, Cytek will be excluded from the BD Service Market entirely. The result will be an increase in service work for BD—whether through its own service contracts or outsourced work for third-party service contracts—and higher costs and inferior customer experiences for Cytek's current service customers.

59.     BD's efforts to spread misinformation about Cytek and improperly pressure potential customers from purchasing Cytek machines have materially affected Cytek's business. Since BD has started with its false statements and threats to potential customers, the rate at which Cytek converts a demonstration of its Aurora product to a sale dropped by approximately 40% and has only slightly recovered. On information and belief, Cytek's drop in instrument sales from 2017 to 2018 resulted directly from BD's efforts to stifle demand for Cytek products, including by coercing potential customers to not purchase Cytek's Aurora.

60.     Cytek's Athena and Aurora platforms, which are customizable by the purchaser, range in price from tens of thousands of dollars for the Athena to more than $250,000 for an Aurora (depending on the precise configuration). Thus, although Cytek's full damages are as yet unknown, the impact of BD's unlawful and unfair business practices on Cytek's sales alone is estimated to be in the millions. Unless BD's illegal conduct is stopped by this Court, this impact will only worsen.

61.     Cytek is confident that discovery in this action will yield additional evidence of wrongdoing on BD's part, and therefore reserves the right to assert additional counterclaims against BD, including for tortious interference. For now, Cytek asserts the following counterclaims against BD.

## FIRST CAUSE OF ACTION

### SHERMAN ANTITRUST ACT, 15 U.S.C. § 2

62.     Cytek repeats and realleges each and every allegation in the foregoing paragraphs 1 through 61 as though fully set forth herein.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

63.     Section 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2, makes it illegal to "monopolize, or attempt to monopolize . . . any part of the trade of commerce among the several States, or with foreign nations . . . ."

64.     BD is violating, and at least threatening to violate, Section 2 of the Sherman Act by monopolizing the BD Service Market.  BD possesses monopoly power in the BD Service Market and is willfully acquiring/maintaining that power through improper means—specifically, by refusing to supply Cytek with essential replacement parts for BD cytometry instruments and thereby driving Cytek out of the BD Service Market.  These essential parts can only be obtained from BD.  Thus, BD is exploiting its unique position in the market for replacement BD parts to strengthen its monopoly power in the BD Service Market.

65.     The relevant market is the BD Service Market, which is dependent on and derivative of the market for flow cytometry instruments generally.  The BD Service Market is not interchangeable with the service market for other brands of cytometry instruments because BD instruments have unique components and service requirements, and because servicing of BD instruments can only be done by experienced technicians who are familiar with the complex BD instruments and the procedures to service them.  BD's monopoly power in the BD Service Market does not arise from contractual rights that BD instrument customers knowingly and voluntarily gave BD, nor do BD instrument customers' selection of BD instruments reflect the functional equivalent of a contractual commitment to service those instruments through BD.  Rather, BD instrument customers who invested in expensive BD instruments understood that they may enter into service agreements with BD, Cytek, or other third-parties to service BD instruments.   Upon information and belief, BD instrument customers did not realize that BD would change its longstanding policy of providing replacement parts to Cytek and thereby eliminate competition in the BD Service Market.

66.     BD engaged in a voluntary and profitable course of dealing for decades by supplying Cytek and its predecessor, Cytek Development, with essential replacement BD parts.  BD has not provided a valid business justification for withholding all of the essential parts from Cytek.  Cytek consistently paid BD its quoted price for replacement parts, and thus BD's unilateral termination of this course of dealing reflects a willingness to forsake short-term profits to achieve an anticompetitive

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

end—*i.e.*, eliminating Cytek from the BD Services Market.

67.     BD has stated to Cytek that it will only provide essential replacement parts for customers that BD services.   Upon information and belief, BD enters into contracts with its service customers under which those customers purchase replacement parts at prices set by BD as necessary to accomplish the desired service.

68.     BD's exclusionary conduct harms competition because it is resulting in Cytek's forced withdrawal from the BD Service Market.  Not only does Cytek stand to lose $8-9 million in annual revenues because of BD's exclusionary conduct, but Cytek customers who will now be forced to obtain servicing from BD—whether through BD service contracts or outsourced work for third-party service contracts—and consequently will face higher service costs and inferior customer experiences.

69.     At the very least, BD is attempting to monopolize the BD Service Market through the exclusionary conduct described above.  BD's specific intent to monopolize and exclude Cytek from the BD Service Market is evidenced by the pretextual justifications it has provided to Cytek for its refusal to supply essential replacement parts, and in the multi-front attack BD is waging on Cytek's business more generally.  Further, to the extent BD does not already hold monopoly power over the BD Service Market, there is a dangerous probability that it will achieve such power by excluding its primary competition for servicing BD instruments—Cytek.

70.     BD's exclusionary conduct has already harmed Cytek in the form of increased service costs.  Moreover, because Cytek will no longer offer BD service contracts beginning in January 2020, Cytek will suffer a pecuniary loss as a consequence of BD's unlawful acts not later than the date this action proceeds to trial.

71.     As a result of BD's exclusionary conduct, Cytek has suffered, and will continue to suffer, irreparable harm to its business reputation, good will, and stature in the business community, for which there is no adequate remedy at law.

72.     Absent injunctive relief against BD's exclusionary conduct, Cytek will continue to be irreparably harmed and BD will continue to be unjustly enriched.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

## SECOND CAUSE OF ACTION

## UNFAIR COMPETITION LAW — CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ.

73.     Cytek repeats and realleges each and every allegation in the foregoing paragraphs 1 through 72 as though fully set forth herein.

74.     California's Unfair Competition Law ("UCL"), Business & Professions Code § 17200 *et seq.*, gives courts the power the enjoin companies such as BD who engage in any unlawful, unfair, or fraudulent business acts or practices.

75.     BD is engaging in unlawful and unfair business practices.[6]  By way of example, BD is violating and/or engaging in conduct that threatens an incipient violation of Section 2 of the Sherman Act, as described *supra*.  BD's conduct also violates the policy and spirit of the Sherman Act because its actual and/or threatened effects are the same as a violation of that Act.  BD's conduct also significantly threatens or harms competition, as described *supra*.

76.     By way of further example, BD has threatened potential Cytek customers that if they purchase a Cytek Aurora platform, BD will refuse to supply those potential customers with reagents essential to the operation of existing cytometers already purchased by those same customers.

77.     These reagents are distinct products that are sold separate and apart from the cytometers that use them.  The reagents at issue include proprietary UV reagents for which there is no market alternative.  BD has 100% of the global market for these UV reagents.  BD's dominant position in the market for cytometer UV reagents is sufficient to coerce potential Cytek customers from purchasing Cytek products, because BD's refusal to supply these reagents renders the potential customers' existing cytometers substantially impaired, and would require these customers to undertake an expensive and time-consuming re-design of existing cytometer panels, as alleged above.

78.     On information and belief, BD's tying of the sale of its UV (and other) reagents to its

---

[6] Cytek recognizes that the Court has dismissed its UCL counterclaims based on BD's prohibited reagent-tying conduct and illegal employee agreements.  (ECF Nos. 108 & 128.)  Nevertheless, Cytek retains its allegations and UCL counterclaims on those grounds as required to preserve its right to appeal this Court's orders of dismissal.  *See Ho v. ReconTrust Company, NA*, 858 F.3d 568, 577 (9th Cir. 2012). ("We have held that claims dismissed without prejudice and not repleaded are not preserved for appeal; they are instead considered 'voluntarily dismissed.'") (citing *Lacey v. Maricopa Cty.*, 693, F.3d 896, 928 (9th Cir. 2012).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

customers' refusal to purchase competing Cytek machines has had a substantial impact on, and will continue to have a substantial impact on, Cytek's sales of Aurora cytometers and the flow cytometer market overall, in an amount as yet unknown, but estimated to be in the millions, as noted above.  At least one customer has informed Cytek sales personnel that it has not proceeded with an evaluation or purchase of the Cytek Aurora for fear of losing access to BD reagents.  BD's tying conduct threatens to lessen competition for flow cytometers in California and the United States generally.  Cytek's Aurora represents a viable alternative to the far more expensive flow cytometers offered by BD.  As a result of its innovative technology, the Aurora provides superior or equal performance to the BD FACSymphony for half the cost.  By threatening customers' access to necessary BD UV (and other) reagents, BD can eliminate from competition the most cost effective flow cytometer available.

79.    BD's tying conduct is prohibited by and threatens an incipient violation of at least Section 3 of the Clayton Act, 15 U.S.C. § 14, and California's Cartwright Act, Business & Professions Code §§ 16720 and 16727.  BD's tying conduct violates the policy and spirit of these laws because its actual and/or threatened effects are the same as a violation of those laws.  And BD's tying conduct significantly threatens or harms competition.

80.    Finally, BD has engaged in unlawful and unfair business practices by requiring its employees—including certain Individual Defendants—to enter into employee agreements that are illegal under California Business & Professions Code § 16600.

81.    BD's employee agreements include an assignment, or "holdover," provision that requires former employees to assign all "right, title, and interest in any Innovation *relating to* Confidential Information arising because of [their] employment with [BD], conceived or made by [them] . . . at any time for a period of one (1) year after employment . . . ."  An "Innovation" is defined under the BD employee agreements as "any idea, invention, discovery, improvement, copyright, and the like."  "Confidential Information" is broadly defined to include

> any proprietary, business or technical information of the Company [*i.e.*, BD], including *but not limited to* any confidential or unpublished information, business plan, financial information, trade secret, computer program, design, product, process, procedure, formula, research, improvement, work of authorship, or the like, whether of a technical or non-technical nature, relating to the business of the Company or to my activities as

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

20.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

an employee of the Company which was obtained or acquired by me [*i.e.*, each Individual Defendant] during the term of my employment with the Company . . . .

82.     These holdover provisions violate California Business & Professions Code § 16600, which provides, with certain exceptions not applicable here, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

83.     BD has asserted claims in this action against Cytek for inducing breach of these illegal holdover clauses.  To date, BD's inducement claims against Cytek have been dismissed; however, BD continues to seek discovery relevant to its holdover claims.  Moreover, BD has not conceded that its holdover clause is void under California law and has preserved the right to enforce a void provision as to the Individual Defendants and all other employees in California in the future.  Finally, Cytek has already suffered economic injury because it has expended substantial attorneys' fees defending itself against BD's claims based on the illegal holdover provisions.

84.     Cytek has standing to bring a claim under the Unfair Competition Law under Business & Professions Code § 17204 because it has suffered the aforementioned injuries in fact and, on information and belief, has lost money or property as a result of BD's unlawful and unfair business acts and practices in an amount as yet unknown.

85.     As a result of BD's unlawful and unfair business practices, Cytek has also suffered, and will continue to suffer, irreparable harm to its business reputation, good will, and stature in the business community and with its customers and potential customers, for which there is no adequate remedy at law.  On information and belief, BD has not withdrawn the threats to withhold BD reagents that it made to potential purchasers of Cytek flow cytometers.

86.     Absent injunctive relief against BD's unlawful and unfair acts, Cytek will continue to be irreparably harmed.

### THIRD CAUSE OF ACTION

### DECLARATORY RELIEF — 28 U.S.C. § 2201

87.     Cytek repeats and realleges each and every allegation in the foregoing paragraphs 1 through 86 as though fully set forth herein.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC

88.     Cytek and BD are parties to an actual controversy regarding the rights and other legal relations of certain Individual Defendants under employee agreements purportedly entered into with their former employer, BD.

89.     BD's employee agreements with the Individual Defendants include an assignment, or "holdover," provision that requires former employees to assign all "right, title, and interest in any Innovation *relating to* Confidential Information arising because of [their] employment with [BD], conceived or made by [them] . . . at any time for a period of one (1) year after employment . . . ." An "Innovation" is defined under the BD employee agreements as "any idea, invention, discovery, improvement, copyright, and the like." "Confidential Information" is broadly defined to include

> any proprietary, business or technical information of the Company [*i.e.*, BD], including *but not limited to* any confidential or unpublished information, business plan, financial information, trade secret, computer program, design, product, process, procedure, formula, research, improvement, work of authorship, or the like, whether of a technical or non-technical nature, relating to the business of the Company or to my activities as an employee of the Company which was obtained or acquired by me [*i.e.*, each Individual Defendant] during the term of my employment with the Company . . . .

90.     Cytek, who employs the Individual Defendants and whose own employee agreements require the assignment of certain innovations developed by Individual Defendants during their employ by Cytek, contends that BD's holdover provisions are illegal and unenforceable under California Business & Professions Code § 16600, which provides, with certain exceptions not applicable here, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

91.     BD does not dispute that California Business & Professions Code § 16600 applies to its employee agreements with the Individual Defendants, but contends that its holdover provision is valid and enforceable thereunder.

92.     BD's threat of enforcing the employee agreements' holdover provisions—including through claims in this litigation—has created substantial uncertainty over the ownership of innovations developed by certain Individual Defendants in Cytek's employ.

93.     Therefore, Cytek seeks a declaration from this Court that the holdover provisions in BD's employee agreements with the Individual Defendants are void and unenforceable.

Cooley LLP
Attorneys At Law
Palo Alto

22.

Cytek's Second Amended Counterclaims
Case No. 18-cv-00933MMC

**PRAYER FOR RELIEF**

Wherefore, Cytek prays that this Court enter a judgment against BD as follows:

1.      A permanent injunction against BD enjoining it and its representatives from engaging in the unlawful and unfair business practices described herein;

2.      An award of treble damages, costs of suit, and reasonable attorneys' fees to Cytek as a result of BD's violation of the Sherman Act;

3.      A declaration that the holdover provisions in BD's employee agreements are void and unenforceable.

**JURY DEMAND**

Cytek hereby demands a jury trial on all issues and claims so triable.

Dated:      August 7, 2019              COOLEY LLP
                                        STEVEN C. NEAL (170085)
                                        MARTIN S. SCHENKER (109828)
                                        JEFFREY S. KARR (186372)
                                        DANE R. VORIS (281051)


                                        /s/ *Jeffrey S. Karr*
                                        Jeffrey S. Karr (186372)
                                        Attorneys for Defendant and Counterclaimant
                                        Cytek Biosciences Inc.

606856

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

23.

CYTEK'S SECOND AMENDED COUNTERCLAIMS
CASE NO. 18-cv-00933MMC